## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| TERRICO BETHEL, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **Case No. 18-CV-0037-CVE-CDL** |
| | ) | |
| SCOTT CROW,[1] | ) | |
| | ) | |
| Respondent. | ) | |

## <u>OPINION AND ORDER</u>

Petitioner Terrico Bethel seeks federal habeas relief, through a 28 U.S.C. § 2254 petition for

writ of habeas corpus (Dkt. # 1), from the judgment entered against him in the District Court of

Tulsa County, Case No. CF-2009-2738.  Respondent Scott Crow filed a response (Dkt. # 9) in

opposition to the petition, and Bethel filed a reply brief (Dkt. # 18).  Both parties submitted records

(Dkt. ## 1, 9, 10, 11) from state court proceedings.  Having considered those records, the parties'

arguments, and applicable law, the Court finds that Bethel is not entitled to federal habeas relief and

therefore denies the petition for writ of habeas corpus.

### *BACKGROUND*

Following a trial, a Tulsa County jury convicted Bethel of first-degree murder and conspiracy

to commit murder for his role as the gunman in a murder-for-hire plot that resulted in the death of

Neal Sweeney, a Tulsa businessman.  Dkt. # 9-3, <u>Bethel v. State</u>, Case No. F-2012-812 (Okla. Crim.

---

[1]    Bethel is currently incarcerated at the Davis Correctional Facility, a privately-operated prison.  Dkt. # 28.  The Court therefore substitutes Scott Crow, Director of the Oklahoma Department of Corrections, in place of Jerold Braggs, as party respondent.  <u>See</u> FED. R. CIV. P. 25(d); Rule 2(a), <u>Rules Governing Section 2254 Cases in the United States District Courts</u>. The Clerk of Court shall note this substitution on the record.

App. 2014) (OCCA Op.), at 1-7.[2]  The State of Oklahoma (the state) presented evidence at trial establishing that Mohammed Abraham Aziz had a business dispute with Sweeney arising from Aziz's failure to pay for gasoline that Sweeney's company delivered to gas stations owned by Aziz. Dkt. # 9-3, OCCA Op., at 1-2.  Aziz decided to resolve the dispute by enlisting others to kill Sweeney. Dkt. # 9-3, OCCA Op., at 2-3.  Allen Shields and his brother, Fred Shields, agreed to find someone to kill Sweeney if Aziz paid them $10,000.  Dkt. # 9-3, OCCA Op., at 3.  Fred met Bethel while they were both incarcerated at the Osage County jail, and Bethel agreed to kill Sweeney if Fred helped him bond out of jail. Dkt. # 9-3, OCCA Op., at 3-4.  Fred also recruited his cousin, Alonzo "Jack" Johnson, to help with the murder. Dkt. # 9-3, OCCA Op., at 4-7.  Johnson "borrowed" a commercial van from a friend's business in Muskogee and delivered the van to Bethel, who then drove the van to Sweeney's office on the morning of September 4, 2008, and fatally shot Sweeney in the head. Dkt. # 9-3, OCCA Op., at 4-7.

In April 2009, Bethel was incarcerated at the David L. Moss Criminal Justice Center (DLMCJC), in Tulsa, on charges unrelated to Sweeney's murder. Dkt. # 9-3, OCCA Op., at 7. Bethel spoke with Detectives Vic Regalado and Jeff Felton on April 14, 2009. Dkt. # 9-3, OCCA Op., at 7.  The detectives told Bethel that Fred Shields identified him as the person who shot Sweeney. Dkt. # 9-3, OCCA Op., at 7.  Bethel admitted that he knew Fred Shields, but denied involvement in Sweeney's murder.  Dkt. # 9-3, OCCA Op., at 7, 13.

Bethel subsequently described his role in the murder to a fellow inmate, Dolan Prejean. Dkt. # 9-3, OCCA Op., at 7, 18.  Bethel initially told Prejean he was upset over an "M-1," or first degree

---

[2]     The Court's citations generally refer to the CM/ECF header pagination.  Citations to transcripts from state court proceedings also include original page numbers, in brackets, to the extent those page numbers differ from the CM/ECF header pagination.

murder, that he committed with Fred Shields.  Dkt. # 10-16, Tr. Trial vol. 3, at 16-17 [380-81].

During a second conversation, Bethel told Prejean details of the murder that were corroborated by

other witnesses, identified Fred Shields and Johnson as other participants in the conspiracy to kill

Sweeney, and told Prejean that he received $5,000 for the "contract hit."  Dkt. # 9-3, OCCA Op., at

7, 17, 20-21, 33-34; Dkt. # 10-16, Tr. Trial vol. 3, at 18-27 [382-91].  After the second conversation,

Prejean wrote a letter to the district attorney, informed him that Bethel implicated himself in the

Sweeney murder, and volunteered to wear a concealed recording device to prove that Bethel had

confessed.  Dkt. # 9-3, OCCA Op., at 20-21; Dkt. # 10-16, Tr. Trial vol. 3, at 59-63 [423-27].

Prejean testified at Bethel's trial about the incriminating statements Bethel made to him, and the state

introduced, as State's Exhibit 77, the audio recording of incriminating statements Bethel made to

Prejean while Prejean was wearing the concealed recording device.  Dkt. # 9-3, OCCA Op., at 20-21;

Dkt. # 10-16, Tr. Trial vol. 3, at 4 [368], 14-45 [378-409]; Dkt. # 11 (State's Exhibit 77).[3]

After finding Bethel guilty, the jury recommended that he serve life in prison without the

possibility of parole for the murder conviction and a 10-year prison term for the conspiracy

conviction.  Dkt. # 9-3, OCCA Op., at 1.  The trial court sentenced Bethel accordingly and ordered

the sentences to be served consecutively.  Dkt. # 9-3, OCCA Op., at 1.

Represented by counsel, Bethel filed a direct appeal, claiming that (1) the trial court

erroneously admitted involuntary statements he made to Detectives Regalado and Felton and

---

[3]     At Bethel's preliminary hearing, a transcript of State's Exhibit 77 was designated as Court's
        Exhibit 1.  Dkt. # 10-8, Preliminary H'rg Exs., at 10-61.  The transcript was not admitted at
        trial.  Dkt. # 10-16, Tr. Trial vol. 3, at 36-37 [400-01].  The Court has listened to State's
        Exhibit 77, finds the transcript accurately reflects the recorded statements, and provides
        citations to the transcript and State's Exhibit 77 when it quotes Bethel's statements in this
        opinion.

3

incriminating statements he made to Prejean, (2) the trial court erroneously admitted State's Exhibit 77, the audio recording of incriminating statements he made to Prejean, (3) the trial court erroneously admitted the preliminary hearing testimony of Allen Shields, a co-conspirator who committed suicide before Bethel's trial, (4) the trial court erroneously admitted expert opinion testimony from Dr. Eric Pfeifer, regarding the cause and manner of Sweeney's death, because Pfeifer did not perform Sweeney's autopsy, (5) the trial court erroneously admitted State's Exhibit 13, a gruesome and prejudicial photograph, and (6) trial counsel performed deficiently and prejudicially by failing to object at trial to the admission of State's Exhibit 77 and Allen Shields' testimony.  Dkt. # 9-3, OCCA Op., at 8-58.  In an unpublished opinion filed February 10, 2014, the Oklahoma Court of Criminal Appeals (OCCA) rejected each claim on the merits and affirmed Bethel's convictions and sentences.  Dkt. # 9-3, OCCA Op., at 8-58.

Proceeding pro se, Bethel sought postconviction relief.  Dkt. ## 9-4, 9-15.  In his first application for postconviction relief, filed June 3, 2014, Bethel asserted three propositions.  Bethel (1) challenged the admission of State's Exhibit 77 on various grounds, (2) alleged that trial counsel performed deficiently and prejudicially by (a) failing to object to the admission of Detective Regalado's testimony, (b) failing to object, on Fifth Amendment grounds, to the admission of State's Exhibit 77, and (c) failing to object, on First and Fourteenth Amendment grounds, to the admission of State's Exhibit 77, and (3) requested an evidentiary hearing.  Dkt. # 9-4, First Appl., at 3-5.  Within his second proposition, Bethel also asserted that his appellate counsel was ineffective for failing to argue trial counsel's ineffectiveness, failing to adequately argue his First and Fifth Amendment claims, and failing to request an evidentiary hearing.  Dkt. # 9-4, First Appl., at 3-5, 43-45.

The state district court denied Bethel's first application for postconviction relief, finding that "the entire first proposition" was barred by res judicata because the issues raised in that proposition were raised on direct appeal and the OCCA rejected them.  Dkt. # 9-5, Order (Jan. 2, 2015), at 14. The state district court concluded "that [Bethel's] second proposition is also barred as [Bethel's] appellate counsel raised the issue of trial counsel's alleged ineffectiveness on appeal." Dkt. # 9-5, Order (Jan. 2, 2015), at 14.  As to the third proposition, the state district court found it was not an "assignment of error" and denied Bethel's request for an evidentiary hearing.  Dkt. # 9-5, Order, (Jan. 2, 2015), at 14. Bethel attempted to file a postconviction appeal from the denial of his first application for postconviction relief, but the OCCA dismissed the appeal as untimely and because Bethel failed to attach a copy of the district court's order, as required by the OCCA's procedural rules.  Dkt. # 9-7, OCCA Order (Feb. 18, 2015), at 2.

On April 16, 2015, Bethel filed a second application for postconviction relief, seeking an out-of-time postconviction appeal.  Dkt. # 9-8, Second Appl., at 1.  The state district court recommended that Bethel be permitted to file an out-of-time postconviction appeal, and the OCCA granted him leave to do so.  Dkt. ## 9-9, 9-11.  The OCCA later declined jurisdiction over Bethel's out-of-time postconviction appeal, finding that Bethel again failed to attach a copy of the state district court's order.  Dkt. # 9-13, OCCA Order (Feb. 25, 2016), at 1.

On February 22, 2016, Bethel moved to amend or supplement his first application for postconviction relief.  Dkt. # 9-14, Mot., at 1.  Four days later, on February 26, 2016, Bethel filed a third application for postconviction relief.  Dkt. # 9-15, Third Appl., at 1.  In his third application, Bethel asserted four claims challenging the admission of State's Exhibit 77, an ineffective-assistance-of-trial-counsel (IATC) claim, an ineffective-assistance-of-appellate-counsel (IAAC)

claim, and a claim alleging that the prosecutor committed misconduct when he "failed to correct and relied on perjured testimony of [the state's] star witness Prejean" and "withheld, suppressed and concealed" evidence regarding the state's "tacit" agreement to recommend leniency to Prejean in exchange for Prejean's "witness informant activities and trial testimony." Dkt. # 9-17, Order (Mar. 1, 2017), at 6. The prosecutorial-misconduct claim was the same claim Bethel sought leave to add through his motion to amend or supplement his first application for postconviction relief. Dkt. # 9-14, Mot., at 3-4.

In an order filed March 1, 2017, the state district court denied Bethel's motion to amend or supplement his first application for postconviction relief, reasoning that the when Bethel failed to perfect his out-of-time postconviction appeal, "the first application became a final judgment and as such, was no longer subject to further litigation, supplementation, or amendment." Dkt. # 9-17, Order (Mar. 1, 2017), at 7-8. The state district court denied postconviction relief as to the four claims challenging the admission of State's Exhibit 77 and the IATC claim, reasoning that because Bethel asserted those claims on direct appeal and in his first application for postconviction relief, those claims were barred by the doctrine of res judicata. Dkt. # 9-17, Order (Mar. 1, 2017), at 9. The state district court denied postconviction relief as to Bethel's IAAC claim and prosecutorial-misconduct claim, reasoning that because both claims could have been raised in Bethel's first application for postconviction relief, both claims were barred by the doctrine of waiver. Dkt. # 9-17, Order (Mar. 1, 2017), at 10.

Bethel filed a timely postconviction appeal and, in an order filed September 11, 2017, the OCCA affirmed the denial of Bethel's third application for postconviction relief. Dkt. # 9-21, OCCA Order (Sept. 11, 2017), at 1. Applying OKLA. STAT. tit. 22, § 1086, the OCCA agreed with

the state district court's determination that Bethel failed to demonstrate a "sufficient reason" for his failure to "rais[e] in prior proceedings those claims he presented in his February 26, 2016, filings" and found no error in the state district court's application of res judicata to those claims Bethel had raised in prior proceedings. Dkt. # 9-21, OCCA Order (Sept. 11, 2017), at 3-6.  The OCCA specifically rejected Bethel's assertion that "he did not have a full and fair opportunity to litigate his ineffective-assistance-of-appellate-counsel claim in his original [postconviction] application." Dkt. # 9-21, OCCA Order (Sept. 11, 2017), at 4-5.

Proceeding pro se,[4] Bethel filed the instant federal habeas petition (Dkt. # 1) on January 16, 2018.

## DISCUSSION

Bethel seeks federal habeas relief on seven grounds.  In grounds one, two, three and four, Bethel claims that the trial court violated his constitutional rights, under the First, Fifth, Sixth and Fourteenth Amendments, by admitting certain evidence at trial. Dkt. # 1, Pet., at 6-25.  In grounds five and six, Bethel claims that he was deprived of his Sixth Amendment right to the effective assistance of trial and appellate counsel. Dkt. # 1, Pet., at 26-28.  In ground seven, Bethel claims that his convictions were obtained in violation of his Fourteenth Amendment rights to due process and a fair trial because the prosecutor withheld evidence of a tacit agreement between the state and Dolan

---

[4]     Because Bethel appears without counsel in this action, the Court liberally construes his pleadings.  Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).  The rule of liberal construction requires courts to overlook basic drafting errors and apply "a less stringent standard" when reading a pro se litigant's pleading than it would when reading a pleading drafted by a lawyer.  Id.  But even a pro se litigant must provide "sufficient facts" to support his claims, and courts are neither required nor permitted "to assume the role of advocate for the pro se litigant."  Id.; see also Garrett v. Selby Connor Maddux & Janer, 425 F.3d 836, 840 (10th Cir. 2005) (noting that courts "cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record").

Prejean, wherein the state would recommend a lenient sentence in exchange for Prejean's trial testimony, and the prosecutor failed to correct Prejean's perjured trial testimony denying the existence of any agreement.  Dkt. # 1, Pet., at 29-30.

## I.    Legal framework

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court's authority to grant federal habeas relief to a state prisoner is limited in three significant ways.  First, a federal court may grant habeas relief to a prisoner in custody pursuant to a state-court judgment "only on the ground that [the prisoner] is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); see also Wilson v. Corcoran, 562 U.S. 1, 5 (2010) ("[I]t is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal courts.").  Second, a federal court may grant habeas relief only if the prisoner has either (1) exhausted available state remedies, 28 U.S.C. § 2254(b)(1)(A), or (2) demonstrated a complete absence of available state remedies or an absence of effective state remedies, 28 U.S.C. § 2254(b)(1)(B).  Third, a federal court may grant habeas relief on a federal claim that was adjudicated on the merits in state court only if the prisoner makes a threshold showing that the state court's decision either (1) "was contrary to . . . clearly established Federal law," 28 U.S.C. § 2254(d)(1), (2) "involved an unreasonable application of clearly established Federal law," id., or (3) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2).

The procedural-default doctrine imposes a fourth limitation on granting federal habeas relief. Under that doctrine, a federal court not may may not review "federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and

independent state procedural rule"—unless the prisoner demonstrates either cause for the procedural default and resulting prejudice or that the federal court's failure to review the claim will result in a fundamental miscarriage of justice. Davila v. Davis, 137 S. Ct. 2058, 2064-65 (2017); Coleman v. Thompson, 501 U.S. 722, 750 (1991).

Even if a state prisoner presents a timely habeas petition, asserts only properly exhausted federal claims, and makes the threshold showings necessary either to overcome § 2254(d)'s bar to relief as to claims the state court adjudicated on the merits or to overcome the procedural default as to claims the state court rejected on procedural grounds, the prisoner is not necessarily entitled to federal habeas relief. Rather, the federal court will review the prisoner's federal claims de novo and, if it finds error, will apply a harmless-error analysis to determine whether habeas relief is warranted. See Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (explaining that if the federal court finds a constitutional error on de novo review, the court "must assess [its] prejudicial impact . . . under the 'substantial and injurious effect' standard set forth in Brecht [v. Abrahamson, 507 U.S. 619 (1993)], whether or not the state appellate court recognized the error and reviewed it for harmlessness"); Cuesta-Rodriguez v. Carpenter, 916 F.3d 885, 898 (10th Cir. 2019) ("Claims that the state court didn't adjudicate on the merits, we review de novo."); Milton v. Miller, 744 F.3d 660, 670-71 (10th Cir. 2014) (explaining that satisfaction of § 2254(d)'s standards "effectively removes AEDPA's prohibition on the issuance of a writ" and "requires [a federal habeas court] to review de novo" petitioner's claims). Under the Brecht standard, a federal court will grant habeas relief only if the court "is in grave doubt as to the harmlessness of an error that affects substantial rights." O'Neal v. McAninch, 513 U.S. 432, 445 (1995).

9

## II.     Analysis

Crow concedes that Bethel timely filed his petition and that he exhausted available state remedies as to all claims raised therein.  Dkt. # 9, Resp., at 3.  Crow contends, however, that Bethel is not entitled to federal habeas relief.  As to the claims asserted in grounds one, two, three and four, Crow contends that 28 U.S.C. § 2254(d) bars relief because Bethel cannot show that the OCCA's adjudication of these claims resulted in a decision that is contrary to clearly established federal law, that involves an unreasonable application of clearly established federal law, or that rests on an unreasonable determination of the facts presented in state court.  Dkt. # 9, Resp., at 5.  As to the claims asserted in grounds five, six and seven, Crow contends that the procedural-default doctrine bars relief because the OCCA rejected those claims on independent and adequate state law procedural grounds, and Bethel has not made the necessary showings to overcome the procedural default of those claims.  Dkt. # 9, Resp., at 4.

### A.     Claims adjudicated on the merits[5]

As previously stated, § 2254(d) bars habeas relief on federal claims that were adjudicated by a state court unless the prisoner first shows that the state court's decision either (1) "was contrary to . . . clearly established Federal law," 28 U.S.C. § 2254(d)(1),  (2) "involved an unreasonable application of clearly established Federal law," id., or (3) "was based on an unreasonable

---

[5]     Bethel requests an evidentiary hearing on some claims that were adjudicated on the merits in state court.  Dkt. # 1, Pet., at 8; Dkt. # 18, Reply Br., at 4-5.  Because Crow contends that § 2254(d) bars relief as to all claims that were litigated in state court, this Court must analyze those claims within § 2254(d)'s framework based on the existing state-court record.  Cullen v. Pinholster, 563 U.S. 170, 185 (2011).  If Bethel overcomes the bar imposed by § 2254(d), the Court will then consider whether an evidentiary hearing is warranted on any claims subject to de novo review.

determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2).

As used in § 2254(d)(1), the phrase "clearly established Federal law" means "the governing legal principle or principles" stated in "the holdings, as opposed to the dicta, of [the United States Supreme Court's] decisions as of the time of the relevant state-court decision." Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 412 (2000)). "To determine whether a particular decision is 'contrary to' then-established law, a federal court must consider whether the decision 'applies a rule that contradicts [such] law' and how the decision 'confronts [the] set of facts' that were before the state court." Pinholster, 563 U.S. at 182 (alterations in original) (quoting Williams, 529 U.S. at 405, 406). "If the state-court decision 'identifies the correct governing legal principle' in existence at the time, a federal court must assess whether the decision 'unreasonably applies that principle to the facts of the prisoner's case.'" Id. (quoting Williams, 529 U.S. at 413). Under § 2254(d)(1), the federal court must find that the state court's application of the law was "'objectively unreasonable,' not merely wrong; even clear error will not suffice." White v. Woodall, 572 U.S. 415, 419 (2014) (quoting Lockyer, 538 U.S. at 75-76).

Under § 2254(d)(2), habeas review focuses on the state court's determination of the facts it relied on to adjudicate the federal claim. A state prisoner can establish that a state court decision on a federal claim rests on an unreasonable determination of the facts if the prisoner shows either that the state court "plainly and materially misstated the record" or "that reasonable minds could not disagree that the finding was in error." Smith v. Duckworth, 824 F.3d 1233, 1250 (10th Cir. 2016). But "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301 (2010).

11

"As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." Harrington v. Richter, 562 U.S. 86, 102 (2011). Congress intended that the standards in § 2254(d) would be "difficult to meet" because "state courts are the principal forum for asserting constitutional challenges to state convictions." Id. at 102-03. As a result, to obtain federal habeas relief on claims subject to review under § 2254(d)(1), "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.

With these standards in mind, the Court turns to Bethel's claims that the OCCA adjudicated on the merits.

### 1.    Admission of Bethel's statements to law enforcement officers

Bethel claims, in ground one, that the trial court violated his rights, under the Fifth and Fourteenth Amendments, when it erroneously admitted statements that Bethel made to Detectives Regalado and Felton during an interview on April 14, 2009. Dkt. # 1, Pet., at 6. Bethel argues that his statements were inadmissible because the detectives asked him questions about his knowledge of the Sweeney murder, while he was in custody on charges unrelated to the murder, without first advising him of his Fifth Amendment right against self-incrimination, as required by Miranda v. Arizona, 384 U.S. 436 (1966). Dkt. # 1, Pet., at 6-10.

The Fifth Amendment to the United States Constitution,[6] provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  In

---

[6]    "The Fifth Amendment applies to the states through incorporation of the Fourteenth Amendment." Vogt v. City of Hays, 844 F.3d 1235, 1239 n.1 (10th Cir. 2017) (citing Malloy v. Hogan, 378 U.S. 1, 6 (1964)).

Miranda, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the [Fifth Amendment] privilege against self-incrimination."  384 U.S. at 444.  The Miranda Court described "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  Id.  In the decades since Miranda was decided, the Supreme Court has further refined the circumstances that require Miranda warnings and that require suppression of a defendant's statements to law enforcement officers when such warnings are not provided.

For example, in Illinois v. Perkins, 496 U.S. 292, 297 (1990), the Supreme Court explained that "[i]t is the premise of Miranda that the danger of coercion results from the interaction of custody and official interrogation" and "reject[ed] the argument that Miranda warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent."  More recently, the Supreme Court found it "abundantly clear that [its] precedents do not clearly establish . . . that the questioning of a prisoner is always custodial when [a] prisoner is removed from the general population and questioned about events that occurred outside the prison."  Howes v. Fields, 565 U.S. 499, 505 (2012).  The Fields Court explained that "[a]s used in [its] Miranda case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion."  Fields, 565 U.S. at 508-09.  Thus, the Fields Court reiterated, to determine whether an individual is in custody for Miranda purposes, the reviewing court should first consider "whether [the] individual's freedom of movement was curtailed."  Fields, 565 U.S. at 508-09.  However, when an individual is already incarcerated

13

standard conditions of confinement and associated restrictions on freedom will not necessarily implicate the same interests that the Court sought to protect when it afforded special safeguards to persons subjected to custodial interrogation. Thus, service of a term of imprisonment, without more, is not enough to constitute <u>Miranda</u> custody.

<u>Fields</u>, 565 U.S. at 512.  As a result, the <u>Fields</u> Court explained, "[w]hen a prisoner is questioned, the determination of custody should focus on all the features of the interrogation." <u>Id.</u> at 514.

Bethel presented his Fifth Amendment claim on direct appeal, and the OCCA rejected it. The OCCA identified the challenged statements, admitted through Detective Regalado's trial testimony, as Bethel's statements (1) that he knew Fred Shields, a co-conspirator who previously had been questioned about the Sweeney murder and who had implicated Bethel as the shooter, and (2) that he and Fred Shields met while they were incarcerated at the Osage County jail. Dkt. # 9-3, OCCA Op., at 9 n.2; <u>see also</u> Dkt. # 10-16, Tr. Trial vol. 3, at 167-68 [531-32] (Detective Regalado's testimony). The OCCA noted that Bethel moved to suppress these statements before trial, that the trial court denied the suppression motion following a hearing, and that Bethel failed to renew his objection at trial when Regalado testified about statements Bethel made during the interview. Dkt. # 9-3, OCCA Op., at 8.  Reviewing Bethel's claim for plain error,[7] the OCCA found no error.

---

[7]    Bethel contends that the OCCA's decision to review this claim under its plain-error standard was based on the OCCA's objectively unreasonable factual determination that he failed to renew his objection at trial to the admission of his interview statements. Dkt. # 1, Pet., at 7. But Bethel fails to identify any specific portion of the transcripts to rebut the OCCA's finding that he did not renew his objection, and the portion of the trial transcript that refers to Detective Regalado's testimony regarding the April 14, 2009, interview reveals no contemporaneous objection. Dkt. # 10-16, Tr. Trial vol. 3, at 167-68 [531-32]. In any event, it is the OCCA's ultimate decision as to Bethel's Fifth Amendment claim, not the OCCA's decision as to which appellate standard of review applies to that claim, that is subject to federal habeas review under § 2254(d)'s framework.

In addressing this claim, the OCCA discussed legal principles from <u>Miranda</u>, <u>Perkins</u>, and <u>Fields</u>.  Dkt. # 9-3, OCCA Op., at 9-12.  The OCCA acknowledged that the Supreme Court "reject[ed] the argument that <u>Miranda</u> warnings are required whenever a suspect is in custody in a technical sense," Dkt. # 9-3, OCCA Op., at 10 (quoting <u>Perkins</u>, 496 U.S. at 297), and framed the question of whether an already incarcerated prisoner is subject to a custodial interrogation as one requiring the reviewing court to "focus on all of the features of interrogation . . . includ[ing] the language that is used in summoning the prisoner to the interview and manner in which the interrogation is conducted," Dkt. # 9-3, at 11-12 (quoting <u>Fields</u>, 565 U.S. at 514).

The OCCA found that Bethel's "freedom of movement was restrained" because "[h]e was incarcerated at the [DLMCJC] on unrelated charges" when the detectives transported him to the police station to conduct the interview.  Dkt. # 9-3, OCCA Op., at 12.  The OCCA thus determined that it should "review all the features of the detectives' interview with [Bethel] to ascertain whether the relevant environment presents the same inherently coercive pressure as the type of station house questioning at issue in <u>Miranda</u>."  Dkt. # 9-3, OCCA Op., at 12.  Summarizing facts that were stipulated to by both parties at the suppression hearing, the OCCA stated:

> Nothing about the detectives' language or [Bethel's] physical surroundings added to the imposition on his freedom.  The detectives advised [Bethel] that they were investigating the Sweeney murder.  They informed [him] that Fred Shields had stated that [Bethel] had committed the offense. [Bethel] stated that he had met Fred Shields while incarcerated in the Osage County jail but did not know why Shields would lie or give false information to the police.  The detectives showed [Bethel] a photograph of Aziz and [Bethel] stated he did not know the person in the photograph. [Bethel] denied any knowledge of the offense.  The detectives offered to show [Bethel] the video of Fred Shields naming him as the gunman. [Bethel] declined the opportunity to view the video.  Instead, he told them he wanted to go back to the jail.  The detectives ended the interview.  They left [Bethel] in the interview room as they made arrangements to transport him back to the jail.  As an afterthought, they asked [Bethel] for a buccal swab. [Bethel] stated: "Do I need a lawyer?" (March 23, 2010

15

Tr. 6).  The officers asked [Bethel] if he had a lawyer and he gave them the name of his attorney on his unrelated cases.  The officers contacted the attorney but he was unavailable.  They transported [Bethel] back to the jail facility.  On the way back to the jail, [Bethel] spoke to the Detectives concerning other cases around town that were not related to the Sweeney murder.  After the interview, the detectives did not believe that [Bethel] was involved in the killing of Neal Sweeney.

Dkt. # 9-3, OCCA Op., at 13-14.  Applying the law to these undisputed facts, the OCCA found no error in the trial court's admission of Bethel's statements, reasoning:

Nothing in the record supports [Bethel's] argument that he was physically restrained or accused of committing the homicide.  As [Bethel] was given the choice whether to participate in the interview in the first instance, questioned in the detective division's interview room, provided a glass of water to drink, only questioned for a very short period of time, not physically restrained, and ultimately felt free to end the conversation by asking to be returned to the jail, we find that the objective features of the interview were consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave. . . . Therefore, [Bethel] was not in custody for the purposes of Miranda.

Dkt. # 9-3, OCCA Op., at 15.

Bethel contends that the OCCA's decision rejecting his Fifth Amendment claim is based on an objectively unreasonable determination of the facts, and is contrary to, and an unreasonable application of, clearly established federal law.  Dkt. # 1, Pet., at 7-8.  For two reasons, the Court disagrees.

First, it is evident from the OCCA's discussion of Miranda and Supreme Court cases applying Miranda in the specific context of police questioning of incarcerated individuals, that the OCCA identified the correct legal principles governing Bethel's claim.  As a result, Bethel cannot show that the OCCA's decision was contrary to clearly established federal law.  See Williams, 529 U.S. at 406 (noting that "a run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case would not fit comfortably within

16

§ 2254(d)(1)'s 'contrary to' clause").   Second, Bethel fails to demonstrate how the OCCA's application of controlling Supreme Court precedent was objectively unreasonable or how it was based on an unreasonable determination of the facts.  The OCCA rested its decision on undisputed facts regarding Bethel's April 14, 2009, interview and found that Bethel was not subjected to a custodial interrogation.  Those  undisputed facts show that Bethel agreed to speak to the detectives, that the detectives "did not confront [him] with his guilt on the case but only asked general questions," that Bethel declined the detectives' offer to view the videotape of Fred Shields' statement implicating Bethel, that Bethel denied knowledge of the Sweeney murder, and that the detectives ended the interview and returned Bethel to the jail after Bethel advised the detectives that he was ready to leave.  Dkt. # 9-3, OCCA Op., at 12-14.  On the record presented, Bethel has not shown that the OCCA unreasonably determined the facts or unreasonably applied clearly established federal law in rejecting his Fifth Amendment claim.

For these reasons, the Court agrees with Crow that § 2254(d) bars relief.[8]   The Court therefore denies the petition as to ground one.

---

[8]   Even if Bethel could show that the alleged Fifth Amendment violation occurred, the Court would find that error harmless.  As previously stated, Bethel's only statements to detectives that were admitted at trial evidenced that he met Fred Shields while they were in the Osage County jail.  Without more, it is not clear how those statements would incriminate him in the Sweeney murder.  And even if those statements were excluded, the state presented testimony from other witnesses to establish the connections among Bethel, Fred and Allen Shields, and Alonzo "Jack" Johnson.  Further, the jury heard Bethel describing his role in the murder to Prejean when the state presented State's Exhibit 77.  On the facts of this case, any violation arising from the admission of Bethel's unMirandized statements to Detective Regalado was harmless under Brecht.

### 2.      Admission of Dolan Prejean's testimony and State's Exhibit 77

In ground two Bethel contends that the trial court violated his rights, under the First, Fifth and Fourteenth Amendments, (1) by admitting the testimony of Dolan Prejean, a state witness who testified about incriminating statements Bethel made to Prejean while the two were incarcerated at the DLMCJC, and (2) by admitting State's Exhibit 77, an audio recording of incriminating statements Bethel made to Prejean while Prejean was wearing a concealed recording device.  Dkt. # 1, Pet., at 10-22.

Crow characterizes Bethel's ground two claim as challenging only the admission of State's Exhibit 77, Dkt. # 9, Resp., at 15, but the Court disagrees.  At trial, Prejean testified that he had three conversations with Bethel:  the substance of the first two conversations was admitted through Prejean's trial testimony, while the substance of the third conversation was admitted through State's Exhibit 77.  Dkt. # 10-16, Tr. Trial vol. 3, at 14-37 [378-401].  On direct appeal, Bethel challenged the admission of State's Exhibit 77 as violating his rights under the Fifth and Fourteenth Amendments and challenged the admission of all of his statements to Prejean as violating his statutory right to religious privilege, under OKLA. STAT. tit. 12, § 2505, and his rights under the First and Fourteenth Amendments.  Dkt. # 9-1, Appellant's Br., at 27-46; Dkt. # 9-3, OCCA Op., at 18-41.  Liberally construing the petition, it appears Bethel is attempting to reassert the same challenges to the admission of Prejean's testimony and State's Exhibit 77 that he raised on direct appeal.  Dkt. # 1, Pet., at 10-22.  The Court will therefore address Bethel's arguments in ground two as he raised them on direct appeal and, as necessary to better understand his arguments, will refer to the brief he submitted to the OCCA on direct appeal.

18

a.      **Fifth Amendment claim**

On direct appeal, Bethel challenged the admission of State's Exhibit 77 as a violation of his

Fifth Amendment right to counsel.  Dkt. # 9-1, Appellant's Br., at 27.  Bethel argued that he "made

an unequivocal request for counsel on April 14, 2009," when Detectives Regalado and Felton

interviewed him, thereby coming under the protection of the rule announced in Edwards v. Arizona,

451 U.S. 477 (1981), and that the detectives impermissibly reinitiated contact with Bethel by using

Prejean as their agent to elicit and record Bethel's incriminating statements on April 30, 2009.  Dkt.

# 9-1, Appellant's Br., at 27-31.  Bethel appears to reassert these same arguments to support his

request for habeas relief.  Dkt. # 1, Pet., at 10-21; Dkt. # 18, Reply Br., at 26-29.

According to the Supreme Court, "Miranda . . . declared that an accused has a Fifth and

Fourteenth Amendment right to have counsel present during custodial interrogation." Edwards, 451

U.S. at 481.  The Edwards Court held that when "an accused in custody . . . has clearly asserted his

right to counsel," law enforcement officers must end the interrogation and cannot resume questioning

"until counsel has been made available . . . unless the accused himself initiates further

communication, exchanges, or conversations with the police."  451 U.S. at 484-85; see also Davis

v. United States, 512 U.S. 452, 459 (1994) (noting that "the suspect must unambiguously request

counsel" to invoke the Edwards rule); McNeil v. Wisconsin, 501 U.S. 171, 177 (1991) ("Once a

suspect invokes the Miranda right to counsel for interrogation regarding one offense, he may not be

reapproached regarding any offense unless counsel is present.").

But the Edwards rule applies only if the accused is in custody for purposes of Miranda when

he is first interrogated and when he makes the statements allegedly obtained in violation of the

Edwards rule during a subsequent interrogation.  See Maryland v. Shatzer, 559 U.S. 98, 116 (2010)

(describing "the foundation for Edwards" as "the accumulated coercive pressures of custody" that may coerce a suspect who has previously invoked his Fifth Amendment right to counsel to agree waive that right during a subsequent custodial interrogation); Montejo v. Louisiana, 556 U.S. 778, 795 (2009) ("The Miranda-Edwards regime . . . applies only in the context of custodial interrogation"). The Shatzer Court also made clear that the protection provided by the Edwards rule is not "eternal." Shatzer, 559 U.S. at 109. Rather, the Shatzer Court reasoned, "[t]he protections offered by Miranda, which [the Supreme Court has] deemed sufficient to ensure that the police respect the suspect's desire to have an attorney present the first time police interrogate him, adequately ensure that result when a suspect who initially requested counsel is reinterrogated after a break in custody that is of sufficient duration to dissipate its coercive effects." Shatzer, 559 U.S. at 109. And the Shatzer Court determined that a 14-day break in custody "provides plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody." Id. at 110.

Finally, while the Supreme Court's decision in Perkins did not directly address the Edwards rule, this case too is instructive on Bethel's claim that the Fifth Amendment barred the admission of his statements to Prejean. In Perkins, the defendant challenged the admission of incriminating statements he made, without the benefit of a Miranda warning, to an undercover law enforcement officer who pretended to be a fellow inmate and elicited statements from the defendant implicating the defendant in a murder while the defendant was incarcerated on unrelated charges. Perkins, 496 U.S. at 294. As previously discussed, the Perkins majority "reject[ed] the argument that Miranda warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent." 496 U.S. at 297. Ultimately, the

Perkins Court held "that an undercover law enforcement officer posing as a fellow inmate need not give Miranda warnings to an incarcerated suspect before asking questions that may elicit an incriminating response."   496 U.S. at 300.   The Supreme Court reasoned, in part, that "Miranda forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner," thus, "[t]he interests protected by Miranda are not implicated" when "undercover agents . . . [are] employed in the prison context" and Miranda "warnings are not required to safeguard the constitutional rights of inmates who make voluntary statements to undercover agents." Perkins, 496 U.S. at 297, 300.  The Supreme Court also determined that its Sixth Amendment decisions, holding "that the government may not use an undercover agent to circumvent the Sixth Amendment right to counsel once a suspect has been charged with the crime," do not apply in the Fifth Amendment context. Id. at 299.  Justice Brennan concurred in the judgment, but opined that the "method used to elicit the confession in [Perkins] deserve[d] close scrutiny" under the Fourteenth Amendment's Due Process clause.  Perkins, 496 U.S. at 300-03 (Brennan, J., concurring in the judgment).

Here, the OCCA rejected Bethel's Fifth Amendment challenge to the admission of State's Exhibit 77 on two grounds.  First, applying Davis, the OCCA agreed with the trial court's assessment that Bethel did not unequivocally invoke his Fifth Amendment right to counsel when he stated, "Do I need a lawyer," during the April 14, 2009, police interview.  Dkt. # 9-3, OCCA Op., at 18-22. Thus, the OCCA reasoned, even if it accepted Bethel's view that Prejean acted as an agent of the state when he wore a concealed recording device and urged Bethel to confess, the Edwards rule did not apply to the statements Bethel made to Prejean.  Dkt. # 9-3, OCCA Op., at 18-22.  Second, applying Perkins and Montejo, the OCCA determined that even if it were to find that Bethel had

21

"made a clear and unequivocal request for counsel," the Edwards rule did not require suppression of Bethel's statements to Prejean because Bethel "was not in custody for the purposes of Miranda when he spoke with Prejean on April 30, 2009," and he "was unaware that Prejean was acting on behalf of the [s]tate."  Dkt. # 9-3, OCCA Op., at 22-24.  The OCCA particularly found persuasive Perkins' statement that "Miranda was not meant to protect suspects from boasting about their criminal activities in front of persons whom they believe to be their cellmates."  Dkt. # 9-3, OCCA Op., at 23 (quoting Perkins, 496 U.S. at 298).

Bethel appears to contend that the OCCA's rejection of his Fifth Amendment claim is contrary to clearly established federal law, involves an unreasonable application of clearly established federal law, and is based an unreasonable determination of the facts.  Dkt. # 1, Pet., at 10-21; Dkt. # 18, Reply Br., at 26-29.  Neither the record nor the law supports Bethel's view.

To be fair, Bethel correctly notes that after he asked the detectives, "Do I need a lawyer," the detectives responded by asking if he had a lawyer and, when Bethel provided his lawyer's name, the detectives contacted his lawyer.  Dkt. # 18, Reply Br., at 26; Dkt. # 9-3, OCCA Op., at 20.  However, as discussed in the analysis of Bethel's ground one claim, the OCCA determined that Bethel was not in custody for Miranda purposes when he spoke with the detectives.  Regardless of whether the detectives responded as if Bethel had invoked his Fifth Amendment right to counsel, the detectives were not operating under a constitutional mandate to do so because Miranda was not implicated and, thus, neither was Edwards.  See Montejo, 556 U.S. at 795 ("The Miranda-Edwards regime . . . applies only in the context of custodial interrogation").  Further, even if fairminded jurists might disagree with the OCCA's determinations (1) that Bethel was not in Miranda custody when he spoke to the detectives and (2) that Bethel's inquiry about needing a lawyer was insufficient to invoke his

Fifth Amendment right to counsel, no fairminded jurist would disagree with the OCCA's alternative conclusion that the Miranda-Edwards regime did not require suppression of Bethel's incriminating statements to Prejean because Bethel was not subjected to a custodial interrogation when he made incriminating statements to Prejean, his fellow inmate.  See Perkins, 496 U.S. at 296, 300 ("When a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking" and "the interests protected by Miranda," and thus by Edwards, "are not implicated").[9]

Based on the foregoing, the Court finds that § 2254(d) bars relief and therefore denies the petition as to the Fifth Amendment claim asserted in ground two.

**b.      Fourteenth Amendment due-process claim**

Next, Bethel argued on direct appeal, and he reasserts here, that the admission of State's Exhibit 77 violated his Fourteenth Amendment right to due process because the "police tactic of sending a confidential informant to speak to the suspect in jail" is "fundamentally unfair."  Dkt. # 9-1, Appellant's Br., at 31-33.  In his appellate brief, Bethel cited Justice Brennan's concurring opinion in Perkins for the proposition that law enforcement tactics to obtain a confession through "deception and manipulation . . . raise a substantial claim that the confession was obtained in violation of the Due Process Clause."  Dkt. # 9-1, Appellant's Br., at 32; see Perkins, 496 U.S. at 300-03 (Brennan, J., concurring in the judgment).

---

[9]      The Court finds nothing objectively unreasonable about the OCCA's determinations that Bethel was not in Miranda custody either on April 14, 2009, when he spoke to detectives, or on April 30, 2009, when he confessed to Prejean.  But even if fairminded jurists could disagree and find that Bethel was subject to custodial interrogation on both occasions, Shatzer's 14-day break-in-custody rule and Perkins' rule that undercover agents in prison don't have to reveal themselves by providing Miranda warnings both support that Bethel's statements to Prejean were not coerced and were thus admissible.

As previously discussed, Perkins made clear that the Fifth Amendment's prohibition against self-incrimination is not implicated when an actual law enforcement officer pretends to be an inmate and elicits incriminating statements from another inmate relating to uncharged crimes. 496 U.S. at 299-300. And the Perkins Court expressly stated, "[t]he use of undercover agents is a recognized law enforcement technique, often employed in the prison context to detect violence against correctional officials or inmates, as well as for the purposes served here [of investigating a prisoner's involvement in uncharged crimes]. The interests protected by Miranda are not implicated in these cases, and the warnings are not required to safeguard the constitutional rights of inmates who make voluntary statements to undercover agents." 496 U.S. at 300. Even Justice Brennan's concurring opinion in Perkins, which questioned the Fourteenth Amendment due process implications of using such deceptive tactics to obtain a confession, acknowledged that the primary due-process inquiry is whether the challenged confession was voluntary under all the circumstances of the particular case. 496 U.S. at 300-03 (Brennan, J., concurring in the judgment).

The test for voluntariness of a confession is well-established and asks, "Is the confession the product of an essentially free and unconstrained choice by its maker?" Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973) (quoting Culombe v. Connecticut, 367 U.S. 568, 602 (1961)). If the answer is yes, the confession is voluntary and admissible. Id. But, if the confessor's "will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." Bustamonte, 412 U.S. at 225-26 (quoting Columbe, 367 U.S. at 602).

Applying principles from Perkins, and Bustamonte, the OCCA rejected Bethel's Fourteenth Amendment due-process claim. Dkt. # 9-3, OCCA Op., at 24-28. The OCCA noted that "[d]eception which takes advantage of a suspect's misplaced trust in a friend or fellow inmate does

24

not cause a statement to be involuntary," and further noted that Bethel "confessed to Prejean that he

shot and killed Sweeney as part of a contract hit" in two different conversations with Prejean, only

the latter of which was recorded by Prejean without Bethel's knowledge.  Dkt. # 9-3, OCCA Op.,

at 27.  The OCCA concluded that, under the totality of these circumstances, Bethel's recorded

confession to Prejean was voluntary and was therefore admissible.  Dkt. # 9-3, OCCA Op., at 26.

Bethel asserts that the OCCA's decision on his Fourteenth Amendment claim is contrary to,

or rests on an unreasonable application of, clearly established federal law.  Dkt. # 1, Pet., at 20-21

But the Court finds no support for that assertion.  As previously stated, the OCCA applied

Bustamonte's "voluntariness" test and determined that Bethel voluntarily made incriminating

statements to Prejean, on three separate occasions (unaware that Prejean was not simply offering a

sympathetic ear) and reasoned, in part, that Bethel's "misplaced trust in a friend or fellow inmate"

did not render his statement involuntary.  Dkt. # 9-3, OCCA Op., at 25-27.  On the record presented,

the Court finds nothing objectively unreasonable about the OCCA's determination of the facts or its

application of clearly established federal law as to the Fourteenth Amendment due-process claim

asserted in ground two.

The Court therefore finds that § 2254(d) bars relief and denies the petition as to the

Fourteenth Amendment due-process claim asserted in ground two.

### c.    First and Fourteenth Amendment claims

In his final argument, Bethel reasserts his claim that all of his statements to Prejean were

inadmissible, and should have been excluded, because "they were taken in violation of [his] religious

privilege under OKLA. STAT. tit. 12, § 2505," and that the trial court's refusal to treat his

communications as privileged under § 2505 violated his rights under First and Fourteenth

Amendments.  Dkt. # 9-1, Appellant's Br., at 33-46; Dkt. # 1, Pet., at 10-22.  As he did on direct appeal, Bethel alleges that Prejean held himself out as a "minister of the pod" while they were both incarcerated at the DLMCJC, that Bethel reasonably believed that Prejean was acting as a "religious functionary" and providing "ministerial assistance" to Bethel when he quoted scripture and encouraged Bethel to confess his sins, and that Bethel's conversations with Prejean were therefore confidential and privileged under state law.  Dkt. # 9-1, Appellant's Br., at 33-46; Dkt. # 1, Pet., at 10-22; Dkt. # 1, Pet., at 33-42 (Bethel Aff.).

The Supreme Court has recognized, in dicta, that "[t]he priest-penitent privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return." Trammel v. United States, 445 U.S. 40, 51 (1980).  The Trammel Court also stated that the "privilege[] between priest and penitent . . . limit[s] protection to private communications." Id.  But beyond that, there is no decision from the Supreme Court governing when the priest-penitent privilege applies.  In fact, as the Trammel Court noted, Congress declined to codify nine specific privileges when it enacted Federal Rule of Evidence 501, which generally states that federal common law "governs a claim of privilege unless" the United States Constitution, a federal statute, or Supreme Court rules provide otherwise.  FED. R. EVID. 501; Trammel, 445 U.S. at 47.  As the Trammel Court explained, "[t]he Federal Rules of Evidence acknowledge the authority of the federal courts to continue the evolutionary development of testimonial privileges in federal criminal trials 'governed by the principles of the common law as they may be interpreted . . . in the light of reason and experience.'"  445 U.S. at 47 (quoting FED. R. EVID. 501).

Unlike Congress, the Oklahoma legislature has codified the priest-penitent privilege, referred to as "religious privilege," in OKLA. STAT. tit. 12, § 2505.  That statute provides:

A.    As used in this section:
    1.    A "cleric" is a minister, priest, rabbi, accredited Christian Science practitioner or other similar functionary of a religious organization, or any individual reasonably believed to be a cleric by the person consulting the cleric; and
    2.    A communication is "confidential" if made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication
B.    A person has a privilege to refuse to disclose and to prevent another from disclosing his confidential communication made to a clergyman acting in his professional capacity.
C.    The privilege may be claimed by the person, by the person's guardian or conservator, or by the person's personal representative if the person is deceased.  The cleric is presumed to have authority to claim the privilege but only on behalf of the communicant.

OKLA. STAT. tit. 12, § 2505.

Construing the plain language of this statute, the OCCA reasoned that a person claiming the religious privilege must show (1) "that he or she made a communication to a "clergyman" or "cleric," as defined in § 2505(A)(1), (2) that the communication was confidential, as defined in § 2505(A)(2), and (3) that the "cleric" or "clergyman" was "acting in his professional capacity," as required by § 2505(B).  Dkt. #9-3, OCCA Op., at 29-31.  The OCCA concluded that Bethel failed to make any of these showings.  First, the OCCA noted that Bethel conceded Prejean was not an ordained minister and reasoned that Bethel failed to show that Prejean was "a functionary of a religious organization," which the OCCA defined as an individual who has "official recognition or accreditation through a religious organization."  Dkt. # 9-3, OCCA Op., at 34-36.  The OCCA also found that Bethel could not have reasonably believed that Prejean, a fellow inmate, was a cleric simply because Prejean called himself a "minister of the pod," "quoted scripture and spoke about

27

God," and "had given the word at prayer a couple of times."  Dkt. # 9-3, OCCA Op., at 36-37.

Second, the OCCA found Bethel's communications to Prejean were not confidential because their

first conversation occurred in the open pod and, while the second and third conversations were "in

the multi-purpose room where inmates went to speak to each other one-on-one," the "audio

recording of [Bethel's] third confession to Prejean contains the constant din of the other inmates

speaking in the background" and reflects that "[t]wo separate inmates openly walked in on" that

conversation.  Dkt. # 9-3, OCCA Op., at 37-38.  Third, the OCCA found that Bethel failed to show

that his communications to Prejean were "made to a clergyman acting in his professional capacity."

Dkt. # 9-3, OCCA Op., at 38.  For these reasons, the OCCA concluded that Bethel failed to "meet

his burden to establish the privileged status of his communications with Prejean."  Dkt. # 9-3, OCCA

Op., at 38.

The OCCA also rejected Bethel's argument that the trial court refusal to apply the statutory

religious privilege "on the basis that Mr. Prejean was not a cleric of a traditional religion" violated

his First Amendment's Establishment and Free Exercise clauses.  Dkt. # 9-1, Appellant's Br., at 45;

Dkt. # 9-3, OCCA Op., at 39-41.[10]  Citing Larson v. Valente, the OCCA agreed with Bethel's

assertion that "both the Free Exercise Clause and the Establishment Clause prohibit denominational

preference."  Dkt. # 9-3, OCCA Op., at 40.  But the OCCA found no factual support in the record

for Bethel's First Amendment claim, reasoning,

> The trial court did not deny [Bethel] the right to claim the statutory religious privilege
> based upon the fact that Prejean did not belong to a traditional religion.  The record

---

[10]    The OCCA determined, and the record supports, that Bethel's First Amendment claim was
subject to review only for plain error because he failed to adequately develop any argument
to support the alleged violations of either First Amendment clause before or during his trial.
Dkt. # 9-3, OCCA Op., at 39.

reveals that Prejean belonged to a traditional western religion.  Prejean explained during his testimony that he followed Jesus Christ.

We further find that § 2505 does not give preference or work any deterrence to any denomination, sect or religious belief.  The statute is neutral as to all religions.

Dkt. # 9-3, OCCA Op., at 41.

In his habeas petition, Bethel primarily, and thoroughly, describes several facts supporting his view that both the trial court and the OCCA unreasonably determined the facts when those courts rejected his argument that Prejean was acting as Bethel's minister or that Bethel reasonably believed Prejean was acting in that capacity and that both courts therefore erred in failing to permit him to claim the statutory religious privilege. Dkt. # 1, Pet., at 10-19.  Granted, there are facts in the record, including Prejean's own testimony, supporting that Prejean described himself as a "minister of the pod," sometimes led other inmates in prayer, and quoted bible verses during his recorded conversation with Bethel.  Dkt. # 10-16, Tr. Trial vol. 3, at 64-65 [428-29]; Dkt. # 11 (State's Ex. 77); Dkt. # 1, Pet., at 43-46 (Bethel Aff.).  However, Prejean also testified that in his view, "anybody who talks about Jesus is a minister."  Dkt. # 10-16, Tr. Trial vol. 3, at 65 [429].  Notably, Bethel presented these same facts to the OCCA in his appellate brief.  Dkt. # 9-1, Appellant's Br., at 35-39.  And the OCCA did not disregard or plainly misstate these facts when it rejected Bethel's claim that the religious privilege applied.  Instead, the OCCA considered these facts but found them insufficient to support application of the religious privilege in this case.  Dkt. # 9-3, OCCA Op., at 32-38.  More importantly, the facts Bethel focuses on primarily pertain to his claim that his communications with Prejean were privileged under state law.  To the extent Bethel asks this Court to reconsider the OCCA's interpretation of OKLA. STAT. tit. 12, § 2505, or its determination that his allegedly privileged communications were admitted at trial in violation of state law, he fails to state a

29

cognizable habeas claim.  As Crow contends, a federal court's "role on collateral review isn't to second-guess state courts about the application of their own laws but to vindicate federal rights." Eizember v. Trammell, 803 F.3d 1129, 1145 (10th Cir. 2015); see also Estelle v. McGuire, ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.")

Nevertheless, Bethel also contends that the trial court's failure to apply, and the OCCA's interpretation of, the statutory privilege, violated the First Amendment's Establishment and Free Exercise clauses and his Fourteenth Amendment rights to equal protection of the law and due process.  As a result, the Court must consider Bethel's apparent argument that the OCCA unreasonably applied clearly established federal law when it determined that the trial court's application of OKLA. STAT. tit. 12, § 2505 did not violate his rights, under either the First or the Fourteenth Amendments.  Dkt. # 1, Pet., at 20-21.

Bethel argued on direct appeal that the trial court violated the First Amendment's Establishment and Free Exercise clauses and the Fourteenth Amendment's Equal Protection clause because all three "require that Oklahoma's privilege statute be applied in a non-discriminatory manner."  Dkt. # 9-1, Appellant's Br., at 44.  He further argued that the trial court denied him "the right to claim the religious privilege because Mr. Prejean did not belong to a traditional religion and therefore did not meet the classic definition of a cleric."  Dkt. # 9-1, Appellant's Br., at 44-45.  In addressing these arguments, the OCCA acknowledged that both First Amendment clauses "prohibit denominational preference."  Dkt. # 9-3, OCCA Op., at 40 (citing Larson v. Valente, 456 U.S. 228, 244-46 (1982)).  The OCCA, however, found no First Amendment violations, reasoning that Bethel's "claim of denominational or sect preference [was] not supported by the record."  Dkt. # 9-3,

OCCA Op., at 41.  More specifically, the OCCA found that "[t]he trial court did not deny [Bethel] the right to claim the statutory religious privilege based upon the fact that Prejean did not belong to a traditional religion," because the "record reveals that Prejean belonged to a traditional western religion."  Dkt. # 9-3, OCCA Op., at 41.  The OCCA further found that OKLA. STAT. tit. 12, § 2505 is facially neutral because it "does not give preference or work any deterrence to any denomination, sect or religious belief."  Dkt. # 9-3, OCCA Op., at 41.

In his petition and reply brief, Bethel cites Trammel and several Supreme Court cases generally discussing the First Amendment.  Dkt. # 1, Pet., at 20; Dkt. # 18, Reply Br., at 16-25.  But even liberally construing his pleadings, the Court finds that Bethel fails to identify any Supreme Court decision clearly establishing that a facially neutral state law providing a religious privilege for communications between a criminal defendant and a person the defendant reasonably believes to be a "cleric" must apply that privilege in the factual scenario presented in this case.  See House v. Hatch, 527 F.3d 1010, 1015 (10th Cir. 2008) (interpreting Carey v. Musladin, 549 U.S. 70 (2006), as "instruct[ing] that Supreme Court holdings—the exclusive touchstone for clearly established federal law—must be construed narrowly and consist only of something akin to on-point holdings").  Bethel thus fails to show that the OCCA's decision on his First Amendment claim is either contrary to or an unreasonable application of clearly established federal law.  Moreover, to the extent Bethel's argument could be construed as asserting that the OCCA did not reasonably apply the more general principle that a state may not discriminate between religions in applying the law, the Court finds nothing objectively unreasonable about the OCCA's application of that general principle or its determination of the facts.  Rather, the record fully supports the OCCA's determination that neither

31

the trial court's refusal to apply the religious privilege nor the statute itself violated the prohibition against preferring one religion over another.

Similarly, the Court finds no legal or factual support for Bethel's suggestion that the trial court's refusal to apply the statutory religious privilege in his case or the OCCA's interpretation of the statute, even if erroneous, would constitute an equal protection violation under the Fourteenth Amendment.  See Cummings v. Sirmons, 506 F.3d 1211, 1237 (10th Cir. 2007) (considering and rejecting habeas petitioner's argument "that the OCCA's allegedly erroneous rejection of his argument on direct appeal" violated his Fourteenth Amendment right to equal protection of the law and noting the absence of any "United States Supreme Court decisions . . . holding that a state court's erroneous application of state criminal law can result in a violation of a criminal defendant's equal protection rights").

Finally, Bethel asserts, in part, that the OCCA's interpretation of OKLA. STAT. tit. 12, § 2505 "was such a great departure from the State Courts ordinary construing, interpreting and applications of State statutes" and was so "arbitrary and capricious" that the OCCA violated his Fourteenth Amendment right to due process.  Dkt. # 1, Pet., at 19.  It is not entirely clear from the record that Bethel presented this particular claim in state court.  Regardless, this claim is easily denied on the merits.  See 28 U.S.C. § 2254(b)(2) (providing that a habeas claim may be denied on the merits notwithstanding the petitioner's failure to exhaust available state remedies).  "In rare circumstances, a determination of state law can be 'so arbitrary and capricious as to constitute an independent due process . . . violation.'"  Cummings, 506 F.3d at 1237 (ellipsis in original) (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990)).  Given that Bethel fails to develop any real argument on the alleged due-process violation, resting instead on his conclusory assertion that the violation occurred, Dkt. # 1,

Pet., at 19, the Court is not persuaded that this is one of the rare cases where a state court's application of state law violated due process.

In sum, Bethel's First and Fourteenth Amendment challenges fail for three reasons: (1) Bethel relies, in part, on an alleged error of state law, (2) section 2254(d) bars relief as to the First Amendment and Fourteenth Amendment equal-protection claims, and (3) the Fourteenth Amendment due-process claim lacks merit. For these reasons, the Court denies the petition as to the First and related Fourteenth Amendment claims asserted in ground two.

### d.  Ground two conclusion

Based on the foregoing analysis, the Court denies the petition as to all claims asserted in ground two.

### 3.  Admission of Allen Shields' preliminary hearing testimony

In ground three, Bethel claims that the trial court violated his Sixth Amendment right to confront the witnesses against him, as interpreted in Crawford v. Washington, 541 U.S. 36 (2004), by admitting the preliminary hearing testimony of Allen Shields, a co-conspirator who committed suicide before Bethel's trial. Dkt. # 1, Pet., at 22-23.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.[11] To protect a defendant's constitutional right to confrontation, the Crawford Court held that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required:

---

[11]  Bethel also refers to the Fourteenth Amendment in his ground three and ground four claims, both of which assert Sixth Amendment violations, but those references appear to simply acknowledge that "[t]he Fourteenth Amendment renders the [Confrontation] Clause binding on the States." Michigan v. Bryant, 562 U.S. 344, 352 (2011).

unavailability and a prior opportunity for cross-examination." 541 U.S. at 68. Thus, "[u]nder Crawford, out-of-court testimonial statements may be admitted against a defendant only if either the declarant of those statements testifies at trial or the declarant is now unavailable *and* the defendant had a prior opportunity to cross-examine the declarant." United States v. Pablo, 696 F.3d 1280, 1286 (10th Cir. 2012) (emphasis in original).

The Crawford Court declined to comprehensively define the term "testimonial," but made clear that prior testimony at a preliminary hearing is testimonial. 541 U.S. at 68; Pablo, 696 F.3d at 1287 ("A testimonial statement is a statement that a reasonable person in the position of the declarant would objectively foresee might be used in the investigation or prosecution of a crime."). Thus, if a witness testifies at a preliminary hearing but is unavailable to testify at trial, that witness's "preliminary hearing testimony is admissible only if the defendant had an adequate opportunity to cross-examine" the witness. Crawford, 541 U.S. at 57. But Crawford did not displace the general rule that "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam) (emphasis in original).

The OCCA reviewed Bethel's Sixth Amendment claim for plain error, citing his failure to object to the admission of Shields' testimony either before or during trial, found no error, and rejected Bethel's claim. Dkt. # 9-3, OCCA Op., at 44-52. The OCCA cited Crawford, 541 U.S. at 68, for the proposition that preliminary hearing testimony is "testimonial hearsay" and may not be admitted against a defendant unless (1) the witness is unavailable and (2) the defendant had a prior opportunity to cross examine the witness. Dkt. # 9-3, OCCA Op., at 45. The OCCA noted that Bethel effectively conceded that both requirements were met and thus primarily focused its analysis

34

on Bethel's argument "that his prior opportunity to examine Shields was constitutionally inadequate because new developments and new impeachment evidence came to light after the preliminary hearing and he was unable to question Shields about this material evidence." Dkt. # 9-3, OCCA Op., at 46.

More specifically, the OCCA considered whether Bethel had an adequate opportunity to cross-examine Shields about (1) a plea agreement Shields reached with prosecutors in exchange for his testimony against Bethel and (2) Shields' prior statements to law enforcement officers. Dkt. # 9-3, OCCA Op., at 46. In addition, the OCCA considered whether Bethel had an adequate opportunity to impeach Shields' preliminary hearing testimony by presenting evidence at trial about events involving Shields that occurred after the preliminary hearing, including the standoff with law enforcement officers that ended with Shields' suicide. Dkt. # 9-3, OCCA Op., at 46. As to these arguments, the OCCA evaluated the adequacy of Bethel's opportunity to confront Shields against the principles that (1) the Constitution does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish," and that the right to confront witnesses "is generally satisfied when the defense is given a full and fair opportunity to probe and expose [testimonial] infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." Dkt. # 9-3, OCCA Op., at 46-47 (alteration in original) (quoting Fensterer, 474 U.S. at 20, 22).

Applying principles drawn from Crawford and Fensterer to the facts of Bethel's case, the OCCA concluded that the admission of Shields' testimony did not violate his right to confrontation or his right to a fair trial. Dkt. # 9-3, OCCA Op., at 52. The OCCA reasoned that, at the preliminary hearing, (1) Shields testified at the preliminary hearing that he had been charged with conspiracy to

commit Sweeney's murder, (2) Shields also testified that he negotiated a plea agreement wherein the state agreed to recommend a sentence of 10 years' probation in exchange for Shields' guilty pleas on the conspiracy charge and eight pending charges involving drug-related offenses and his testimony against Bethel and other co-conspirators, and (3) Shields was subjected to relatively lengthy cross-examination not only by Bethel's attorney but also by the attorneys who represented three of Bethel's co-conspirators. Dkt. # 9-3, OCCA Op., at 48-49.  The OCCA further noted that Bethel's attorney "questioned Shields extensively concerning the details of his plea agreement," elicited testimony that Shields previously faced criminal charges for kidnapping and assault and battery, "thoroughly inquired as to whether Allen Shields was testifying truthfully," and elicited testimony demonstrating that Shields' "account [of the conspiracy] had changed over a period of time."  Dkt. # 9-3, OCCA Op., at 49-51.  Finally, the OCCA found that Shields' testimony, "including the cross-examination of all four defense counsel," was admitted at trial and that Detective Regalado testified at trial that after Shields testified at the preliminary hearing, Shields was released from custody and, at some point after his release, Shields took his former girlfriend hostage and fatally shot himself during a standoff with Tulsa law enforcement officers. Dkt. # 9-3, OCCA Op., at 51-52.

Bethel contends that the OCCA's decision on this claim was contrary to Crawford, involves an unreasonable application of Crawford, and was based on an unreasonable determination of the facts presented on direct appeal.  Dkt. # 1, Pet., at 23.  The Court disagrees.

No portion of Bethel's briefing on this claim identifies specific inadequacies in his opportunity for cross-examination or specific deficiencies in the OCCA's decision.  Dkt. # 1, Pet.,

36

at 22-23.  Having reviewed the transcripts of Bethel's preliminary hearing and trial,[12] the Court finds

that the OCCA's determination of the facts relevant to Bethel's Sixth Amendment claim is entirely

consistent with the records of those proceedings.  Moreover, as just discussed, the OCCA not only

correctly identified Crawford and Fensterer as the clearly established federal law governing Bethel's

claim, but also reasonably applied that law to the facts before it.

The Court therefore agrees with Crow that § 2254(d) bars relief and thus denies the petition

as to the Sixth Amendment claim asserted in ground three.

### 4.     Admission of Dr. Eric Pfeifer's testimony

Bethel's ground four claim asserts that the trial court violated his Sixth Amendment right to

confrontation, as interpreted in Crawford, Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009),

Bullcoming v. New Mexico, 564 U.S. 647 (2011), and Williams v. Illinois, 567 U.S. 50 (2012), by

admitting Dr. Eric Pfeifer's opinion testimony as to the cause and manner of Sweeney's death.  Dkt.

# 1, Pet., at 24-25.  Bethel argues the admission of Dr. Pfeifer's opinion testimony violated his right

to confront the witnesses against him because Dr. Pfeifer did not perform Sweeney's autopsy and

the state failed to show that the doctor who performed the autopsy, Dr. Sibley, was unavailable.  Dkt.

# 1, Pet., at 24-25.

As previously discussed, Crawford prohibits the admission at trial of out-of-court testimonial

statements unless the person who made those statements is unavailable to testify at trial and the

defendant had a prior opportunity for cross-examination.  541 U.S. at 68; Pablo, 696 F.3d at 1286.

---

[12]     The redacted transcript of Allen Shields' preliminary hearing testimony was read to the jury
at trial and was designated as Court's Exhibit 1.  See Dkt. # 10-17, Tr. Trial vol. 4, at 63-66
[691-94]; Dkt. # 10-20, Tr. Exs. (envelope 1, part 2), at 27-113.

In Melendez-Diaz, the defendant was tried on a charge of distributing and trafficking cocaine. 557 U.S. at 308.  To prove that the substance found in bags seized from the defendant was cocaine, the trial court admitted, as substantive evidence, three "certificates of analysis" from the state forensic laboratory stating that the substance in the bags was found to contain cocaine.  Id.  The Supreme Court held that the admission of these certificates violated the defendant's right to confrontation because the statements in the certificates were testimonial and the analysts who analyzed the cocaine and prepared the certificates did not testify at trial and thus were not subject to cross-examination.  Id. at 311, 317, 321-22.  In Bullcoming, the Supreme Court held that a forensic report certifying the blood alcohol concentration of a defendant convicted of driving while intoxicated had been admitted into evidence, in violation of the Sixth Amendment, because the statements in the report were testimonial and "[i]nstead of calling the analyst who signed and certified the forensic report, the prosecution called another analyst who had not performed or observed the actual analysis, but was only familiar with the general testing procedures of the laboratory."  See Williams, 567 U.S. 66 (discussing Bullcoming).

In Williams, the Supreme Court confronted a question left open in Bullcoming, namely, whether it violates a defendant's right to confrontation to "allow[] an expert witness to discuss others' testimonial statements if the testimonial statements were not themselves admitted as evidence."  Williams, 567 U.S. at 67 (quoting Bullcoming, 564 U.S. at 673 (Sotomayor, J., concurring, in part)).  The answer to that question is less than clear from the Supreme Court's divided (4-1-4) decision.  See Pablo, 696 F.3d at 1293 (discussing "the discordant 4-1-4 divide of opinions" in Williams).  At issue in that case was the prosecutor's decision to call an expert witness to testify that a DNA profile produced by an outside laboratory, Cellmark, using DNA from a rape

38

kit, matched a DNA profile produced by the state police laboratory using a sample of the defendant's blood. Williams, 567 U.S. at 56 (Alito, J., plurality op.). Three justices concluded that the expert's testimony, which (1) discussed notations on the Cellmark report, (2) "referred to the DNA profile provided by Cellmark as having been produced from semen found on the victim's vaginal swabs" (a fact not based on the expert's personal knowledge), and (3) expressed an opinion based on facts in the Cellmark report the expert assumed as true, did not violate the Confrontation Clause. Williams, 567 U.S. at 56-57 (Alito, J., plurality op.). Those three justices reasoned that, [u]nder settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true," and because the Confrontation Clause "has no application to out-of-court statements that are not offered to prove the truth of the matter asserted." Id. at 57-58. Justice Breyer joined the plurality opinion, but found the answers provided by the plurality and the dissent inadequate. Williams, 567 U.S. at 86-87 (Breyer, J., concurring).

Justice Thomas concurred in the judgment, but found no Confrontation Clause violation. Williams, 567 U.S. at 103-04 (Thomas, J., concurring in the judgment). Justice Thomas reasoned "that there was no plausible reason for the introduction of Cellmark's statements other than to establish their truth" but concluded that the statements from the Cellmark report that were introduced through the expert's testimony were not testimonial. Id. at 104. In a dissent authored by Justice Kagan, four justices agreed with Justice Thomas that the expert witness's "statements about Cellmark's report went to its truth" but concluded the statements were no less testimonial than those at issue in Melendez-Diaz and Bullcoming and thus that "the State could not rely on [the witness's] status as an expert to circumvent the Confrontation Clause's requirements." Williams, 567 U.S. at 126, 138-40 (Kagan, J., dissenting). For reasons further discussed below, the Court finds it

unnecessary to wade any further through waters muddied by <u>Williams</u>.  <u>See id.</u> at 122 (noting that the Supreme Court's "fractured decision" resulted in "five votes to approve the admission of the Cellmark report, but not a single good explanation").

Significantly, in <u>Pablo</u>, the United States Court of Appeals for the Tenth Circuit (Tenth Circuit) considered the impact, if any, of <u>Williams</u> on the Tenth Circuit's prior holding "that the extent to which an expert witness may disclose to a jury an otherwise inadmissible out-of-court statement without implicating a defendant's confrontation rights is a question of degree" and that a <u>Crawford</u> violation would occur "[i]f an expert simply parrots another individual's out-of-court statement, rather than conveying an independent judgment that only incidentally discloses the statement to assist the jury in evaluating the expert's opinion." <u>Pablo</u>, 696 F.3d at 1288.  The Tenth Circuit concisely summarized its understanding the impact of <u>Williams</u> on its own precedent as follows:

> <u>Williams</u> does not appear necessarily to conflict with the "parroting" precedent cited above, but it may add further limitations on the admissibility of testimony regarding the results of lab reports in some cases.  This is because in <u>Williams</u>, five members of the Supreme Court concluded that the out-of-court statements in the report about which the witness testified were being offered for the truth of the matter asserted, even though the in-court witness perhaps was not merely "parroting" out-of-court statements in a DNA analysis produced by someone else; but the witness was implicitly assuming the accuracy of those statements in her discussion of DNA matches that could be made based on the results of that analysis. [. . .] Under <u>Williams</u>, whether a witness's testimony about a lab report produced by someone else must be considered offered for its truth may turn on phrasing subtleties in the prosecutor's questions and the witness's responses.

<u>Pablo</u>, 696 F.3d 1289 (footnotes and internal citations omitted).

Turning back to the instant case, the OCCA rejected Bethel's Sixth Amendment claim, finding no constitutional violation.  In identifying relevant background facts, the OCCA stated,

40

> Dr. Andrew Sibley performed the autopsy on Neal Sweeney's body. Prior to trial, Dr. Sibley was placed on administrative leave. The Chief Medical Examiner, Dr. Eric Pfeifer, was endorsed to testify concerning the cause and manner of Sweeney's death. The State provided [Bethel] with Dr. Pfeifer's independent opinion as to Sweeney's cause of death. [Bethel] filed a motion in limine seeking to exclude Dr. Pfeifer's testimony. At a hearing held on June 15, 2012, the trial court overruled [Bethel's] motion. [Bethel] renewed his motion prior to Dr. Pfeifer's testimony at trial. The trial court overruled [Bethel's] objection and determined that Dr. Pfeifer could testify as to his independent opinion of Sweeney's cause and manner of death.

Dkt. # 9-3, OCCA Op., at 52-53.[13]  In the first part of its analysis, the OCCA discussed its prior decisions in Marshall v. State, 232 P.3d 467 (Okla. Crim. App. 2010), and Cuesta-Rodriguez v. State, 241 P.3d 214 (Okla. Crim. App. 2010), wherein the OCCA determined that trial courts violated the confrontation rights of the defendants in both cases by allowing a testifying expert to "parrot[]" a non-testifying expert's reports and diagrams. Dkt. # 9-3, OCCA Op., at 53-54. In both cases, the OCCA based its determinations on legal principles drawn from Crawford and Melendez-Diaz. See Cuesta-Rodriguez, 241 P.3d at 226-29; Marshall, 232 P.3d at 474-76.

The OCCA, however, found the facts in Bethel's case distinguishable from those in Marshall and Cuesta-Rodriguez and concluded that the trial court did not violate the Sixth Amendment by admitting Dr. Pfeifer's testimony. The OCCA reasoned,

> The record reveals that the State did not introduce any portion of Dr. Sibley's report at trial. Dr. Pfeifer did not parrot Dr. Sibley's observations, findings, descriptions or conclusions. Instead, Dr. Pfeifer testified that he conducted his own independent analysis and reached his own independent opinion. Dr. Pfeifer explained that he looked at the archived autopsy photographs, the toxicology report, the narrative

---

[13]    The OCCA's reference to a hearing held on June 15, 2012, appears to be incorrect. The state moved to endorse Dr. Pfeifer as a witness on June 7, 2012. Dkt. # 10-31, O.R. vol. 9, at 138--39. Bethel filed a motion in limine to exclude Dr. Pfeifer's testimony on August 20, 2012. Dkt. # 10-32, O.R. vol. 10, at 75-76. A hearing on that motion was held at trial, outside the jury's presence, immediately before Dr. Pfeifer testified. Dkt. # 10-17, Tr. Trial vol. 4, at 185-92 [813-20]. If there was a hearing on June 15, 2012, it is not evident from the record. In any event, the OCCA correctly identifies the substance of the trial court's ruling.

report from the investigator, and the other pieces of paper that were archived in the case file concerning Neal Sweeney. He also supplemented the autopsy file with Sweeney's medical records from Saint Francis hospital for the dates of September 4-5, 2008.

The record further reveals that Sweeney's autopsy file and his medical records were the kind of documents that experts in the field normally rely upon. Dr. Pfeifer testified that based on his training and experience he was able to come to an opinion based upon medical reliability even though he did not actually perform the autopsy himself. He explained that if the photographs are of sufficient quality and scope then the injuries are documented and a pathologist can render an opinion even though he or she did not conduct the autopsy. Dr. Pfeifer testified that the photographs regarding Neal Sweeney were detailed and showed the entire process of the autopsy in a progression so that he was able to form his own independent opinion.

Dr. Pfeifer testified as to his own observations of Sweeney's head injury. Based on his training and experience he determined that a penetrating gunshot had caused Sweeney's head injury. He concluded that Sweeney's cause of death was a penetrating gunshot wound to the head and the manner of death was homicide.

Dkt. # 9-3, OCCA Op., at 54-55.

The OCCA further found that the admission of Dr. Pfeifer's opinion testimony was consistent with the Supreme Court's divided decision in Williams. Dkt. # 9-3, OCCA Op., at 55-56. On that point, the OCCA reasoned,

Although Dr. Pfeifer disclosed that he reviewed the autopsy file and Sweeney's medical records, he did not reveal any statement that was contained in the file or records. Dr. Pfeifer did not inform the jury concerning the contents of any of Dr. Sibley's diagrams, notes, findings, observations, conclusions, or statements. As Dr. Pfeifer did not disclose as a basis for his opinion any "statement by a 'witness' within the meaning of the Confrontation Clause" we find that [Bethel's] right to confrontation was not violated.

Dkt. # 9-3, OCCA Op., at 55-56 (footnote omitted) (quoting Sandy Williams, 567 U.S. at 111 (Thomas, J., concurring in the judgment)).

Bethel asserts that the OCCA unreasonably determined the facts and unreasonably applied clearly established federal law when it rejected his Sixth Amendment claim. Dkt. # 1, Pet., at 24-25. On the record presented, the Court disagrees.

42

Granted, the record supports Bethel's argument that the state neither proffered nor proved that Dr. Sibley, the doctor who performed the autopsy, was unavailable to testify.  Dkt. # 1, Pet., at 25.  As the OCCA stated, the record simply shows that Dr. Sibley was "on administrative leave."  Dkt. # 9-3, OCCA Op., at 52.   But Dr. Sibley's unavailability becomes relevant only if testimonial statements from his autopsy report were introduced at trial through Dr. Pfeifer's testimony to prove the truth of the matter asserted.  Williams, 567 U.S. at 57-59 (Alito, J., plurality op.); id. at 103-04 (Thomas, J., concurring in the judgment); Crawford, 541 U.S. at 68; Pablo, 696 F.3d at 1289.

And the trial transcript fully supports the OCCA's determination that no testimonial statements from Dr. Sibley's autopsy report were admitted at trial through Dr. Pfeifer's testimony. After identifying himself as the chief medical examiner for the state and testifying about his training, experience and qualifications, Dr. Pfeifer testified that he reviewed archived autopsy photographs, Dr. Sibley's narrative of the autopsy, the toxicology report, and medical records from St. Francis hospital produced by the trauma surgeon, Dr. Steven Katsis, who treated Sweeney after he was shot. Dkt. # 10-17, Tr. Trial vol. 4, at 192-99 [820-27].  Dr. Pfeifer further testified that, based on his review of these materials, he formed an independent opinion that Sweeney's cause of death was a penetrating gunshot wound to the head and that the manner of death was a homicide.  Dkt. # 10-17, Tr. Trial vol. 4, at 198-99 [826-27].  On this record, the Court cannot agree with Bethel's contention that the OCCA's decision rests on an unreasonable determination of the facts presented in state court.

Moreover, in contrast to the circumstances in Melendez-Diaz and Bullcoming, the autopsy report prepared by Dr. Sibley, the non-testifying witness, was not admitted at trial.  And, in contrast to Williams, Dr. Pfeifer did not testify as to any statements, testimonial or not, that Dr. Sibley made

43

in the autopsy report.  Accordingly, Bethel cannot show that the OCCA's rejection of his Sixth Amendment claim is contrary to or involved an unreasonable application of clearly established law arising from <u>Crawford</u> or its progeny.

For these reasons, the Court finds that § 2254(d) bars relief and therefore denies the petition as to the Sixth Amendment claim asserted in ground four.[14]

### B.    Claims procedurally defaulted in state court

In his remaining claims, Bethel alleges that he was denied his Sixth Amendment right to the effective assistance of trial counsel (ground five), that he was denied his Sixth Amendment right to the effective assistance of appellate counsel (ground six), and that he was denied his Fourteenth Amendment rights to due process and a fair trial because the prosecutor failed to disclose a "tacit prosecution leniency deal" between the state and Dolan Prejean and the prosecutor failed to correct Prejean's false testimony denying the existence of that favorable deal (ground seven).  Dkt. # 1, Pet., at 26-30.

Crow contends that Bethel procedurally defaulted the claims he asserts in grounds five, six and seven.  Dkt. # 9, Resp., at 36, 40.  Crow urges the Court to overlook the procedural default of the ground five claim and deny relief on the merits.  Dkt. # 9, Resp., at 36-40.  As to the claims asserted in grounds six and seven, Crow urges the Court to enforce the procedural bar and deny relief

---

14      Even assuming Bethel could overcome § 2254(d)'s bar, this Court would find, on <u>de novo</u> review, and for the reasons just discussed, that no <u>Crawford</u> violation occurred.  Further, if a violation occurred, the Court would find the constitutional error harmless.  That Sweeney died from a non-accidental gunshot wound to his head was readily established through the testimony of Sweeney's co-workers who rendered first aid immediately after Bethel shot him in the head, and the testimony of the trauma surgeon who treated Sweeney in the emergency room and pronounced him dead on September 5, 2008.  Dkt. # 10-15, Tr. Trial vol. 2, at 150-53 [272-75], 182-84 [304-06]; Dkt. # 10-17, Tr. Trial vol. 4, at 177-84 [805-12].

without considering the merits because Bethel has not made the necessary showings to overcome the procedural default of those claims.  Dkt. # 9, Resp., at 40-45.

Bethel appears to acknowledge that some or all of these claims are procedurally barred, but he asserts that his appellate counsel's ineffectiveness caused the default of the claims asserted in grounds five, six and seven, and that prosecutorial misconduct and a belated discovery of new evidence to support his ground seven claim prevented him from raising that claim on direct appeal or in his first application for postconviction relief.  Dkt. # 1, Pet., at 26-30; Dkt. # 18, Reply Br., at 35-43.

As previously discussed, the AEDPA requires a state prisoner to exhaust available state remedies as to any federal claims before presenting those claims in a federal habeas petition. 28 U.S.C. § 2254(b)(1)(A).  But when a state prisoner presents a federal claim in state court, and the state court denies relief "based on an adequate and independent state procedural rule,"[15] the procedural-default doctrine generally bars the federal habeas court from reviewing that federal claim. Davila, 137 S. Ct. at 2064.  The Davila Court describes the procedural-default doctrine as "an important 'corollary' to the exhaustion requirement because whether the prisoner fails to present the federal claim in state court, or presents the claim in a manner that does not comply with state procedural rules, the prisoner "'has deprived the state courts of an opportunity to address' the merits of those claims in the first instance.'"  137 S. Ct. at 2064 (first quoting Dretke v. Haley, 541 U.S. 386, 392 (2004); then quoting Coleman, 501 U.S. at 731-32).

---

[15]     A state procedural rule "is independent if it is separate and distinct from federal law" and "is adequate if it is 'strictly or regularly followed' and applied 'evenhandedly to all similar claims.'"  Duvall v. Reynolds, 139 F.3d 768, 796-97 (10th Cir. 1998) (quoting Hathorn v. Lovorn, 457 U.S. 255, 263 (1982)).

However, "[a] state prisoner may overcome the prohibition on reviewing procedurally defaulted claims if he can show 'cause' to excuse his failure to comply with the state procedural rule and 'actual prejudice resulting from the alleged constitutional violation.'" Davila, 137 S. Ct. at 2064-65 (quoting Wainwright v. Sykes, 433 U.S. 72, 84 (1977)). To demonstrate cause, a petitioner must "show that some objective factor external to the defense impeded [his] efforts to comply with the [s]tate's procedural rules." Murray v. Carrier, 477 U.S. 478, 488 (1986). "A factor is external to the defense if it 'cannot fairly be attributed to' the prisoner." Davila, 137 S. Ct. at 2065 (quoting Coleman, 501 U.S. at 753). If a petitioner fails to demonstrate "cause," a court need not consider whether he can establish the requisite prejudice. Klein v. Neal, 45 F.3d 1395, 1400 (10th Cir. 1995).[16] And, just as a federal court may deny habeas relief on a claim when a state prisoner fails to exhaust available state remedies as to that claim, 28 U.S.C. § 2254(b)(2), a federal court may overlook the procedural default of a federal claim if that claim is more easily denied on the merits, Smith, 824 F.3d at 1242.

Guided by these principles, the Court turns to Bethel's three remaining claims.

---

[16]    A habeas petitioner can also obtain review of a procedurally defaulted claim if the petitioner establishes that habeas review is necessary to correct a "fundamental miscarriage of justice." Coleman, 501 U.S. at 750. But the miscarriage-of-justice exception applies only "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Carrier, 477 U.S. at 496. Even with the benefit of liberal construction, Bethel's pleadings do not reveal that he has asserted, much less that he has demonstrated, a credible claim of actual innocence. See Schlup v. Delo, 513 U.S. 298, 327 (1995) (explaining that to support a credible claim of actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt").

### 1.   Ineffective assistance of trial counsel

In ground five, Bethel claims that he was denied his Sixth Amendment right to the effective assistance of trial counsel, as interpreted in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), because trial counsel (1) failed to file a pretrial motion to suppress Detective Regalado's testimony and (2) failed to object at trial to the admission of Detective Regalado's testimony, Prejean's testimony, and State's Exhibit 77.  Dkt. # 1, Pet., at 26.

Crow contends, and Bethel acknowledges, that this claim differs from the ineffective-assistance-of-trial-counsel (IATC) claim he raised on direct appeal.[17]  Dkt. # 9, Resp., at 36; Dkt. # 18, Reply Br., at 35.  It appears that Bethel first raised the IATC claim, as he frames it in ground five of the petition, when he filed his reply brief on direct appeal.  Dkt. # 9-3, OCCA Op., at 59 n.7.  But the OCCA declined to consider the additional grounds for trial counsel's alleged ineffectiveness that Bethel raised in the reply brief, finding those grounds were waived pursuant to Rule 3.4(F)(1), <u>Rules of the Oklahoma Court of Criminal Appeals</u>, Title 22, Ch. 18, App. (2014), which provides that "[a]ny propositions of error advanced for the first time in any reply brief shall be deemed waived and forfeited for consideration."  Dkt. # 9-3, OCCA Op., at 59 n.7.  The OCCA's determination that Bethel waived the IATC claim that he now raises in his habeas petition is based on an independent and adequate state procedural rule.  See <u>Smith v. Workman</u>, 550 F.3d 1258, 1274 (10th Cir. 2008) ("[T]his court has found Oklahoma's bar of claims not raised on direct appeal to be independent and

---

[17]     On direct appeal, Bethel argued that trial counsel (1) failed "to ensure that prejudicial other crimes evidence was properly redacted from State's Exhibit 77," and (2) failed "to renew the objection at trial concerning the admission of Allen Shields' preliminary hearing transcript."  Dkt. # 9-1, Appellant's Br., at 57-58.  The OCCA applied <u>Strickland</u> and rejected Bethel's claim, finding that counsel was not ineffective for failing to object to admissible evidence.  Dkt. # 9-3, OCCA Op., at 58-59.

adequate."). Further, applying the doctrine of res judicata, the state district court twice more rejected the IATC claim as procedurally barred when Bethel reasserted it in his first and third applications for postconviction relief. See Dkt. # 9-4, First Appl., at 3-5; Dkt. # 9-5,  Order (Jan. 2, 2015), at 14; Dkt. # 9-15, Third Appl., at 51-55; Dkt. # 9-17, Order (Mar. 1, 2017), at 9.  The OCCA affirmed the denial of Bethel's third application, agreeing with the state district court that the IATC claim was procedurally barred and that Bethel failed to show any "error in the [d]istrict [c]ourt applying res judicata principles to those post-conviction claims that raised issues that [Bethel] had raised on direct appeal or in a previous application." Dkt. # 9-21, OCCA Order (Sept. 11, 2017), at 3-7.  On this record, the Court agrees with Crow that the IATC claim asserted in ground five is procedurally defaulted.

Bethel, however, alleges that he can establish cause for the procedural default because appellate counsel was ineffective for failing to adequately argue trial counsel's ineffectiveness on direct appeal. Dkt. # 1, Pet., at 26; Dkt. # 18, Reply Br., at 35.  In some cases, an appellate counsel's ineffectiveness can establish cause to excuse a procedural default. Edwards v. Carpenter, 529 U.S. 446, 451 (2000).  But "ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim." Id. (emphasis in original).  This means that when a habeas petitioner asserts an ineffective-assistance-of-appellate-counsel (IAAC) claim as cause to excuse the procedural default of another constitutional claim (here, the IATC claim), the petitioner must show that he presented the IAAC claim in state court "in the manner that state law requires." Carpenter, 529 U.S. at 452-53.  Even then, the petitioner cannot simply rest on allegations of ineffectiveness but, rather, must show that appellate counsel's alleged errors, "amounted to a deprivation of the constitutional right to counsel." Davila, 137 S. Ct. at 2065.

48

Bethel's "cause" argument requires the Court to pause, briefly, to discuss the IAAC claim he asserts in ground six of the habeas petition.  Crow contends that Bethel procedurally defaulted the IAAC claim in state court because he did not raise it until he filed his third application for postconviction relief.  Dkt. # 9, Resp., at 40-45. The record suggests Bethel attempted to raise the IAAC claim, or some version of it, in his first application for postconviction relief.  Bethel asserted in his second proposition of his first application for postconviction relief, that both trial counsel and appellate counsel were ineffective. Dkt. # 9-4, First Appl., at 42-45.  The state district court appears to have understood the second proposition as asserting only that trial counsel was ineffective.  Dkt. # 9-5, Order (Jan. 2, 2015), at 13.  And the state district court found that the IATC claim was barred by res judicata because "appellate counsel raised the issue of trial counsel's alleged ineffectiveness on appeal." Dkt. # 9-5, Order (Jan. 2, 2015).  Though not entirely clear, it further appears that the state district court's order did not separately address the IAAC claim.  And Bethel failed to challenge the state district court's ruling when he failed to perfect a postconviction appeal from the denial of his first application for postconviction relief.  Further, when Bethel reasserted his IAAC claim in his third application for postconviction relief, and properly perfected a postconviction appeal from the state district court's order denying the third application, the OCCA affirmed the state district court's decision that the IAAC claim was procedurally barred.  The record thus supports Crow's view that the IAAC claim is procedurally defaulted.  As a result, Bethel cannot rely on the IAAC claim as cause to support his procedural default of the IAAC claim.  Carpenter, 529 U.S. at 452-53.

But even assuming Bethel could demonstrate cause to overcome the procedural default of his IATC claim, the Court would reject that claim on the merits.  To prevail on a Strickland claim, a defendant must show that trial counsel performed deficiently and that the deficient performance

resulted in prejudice.  466 U.S. at 687.  Bethel faults his trial counsel for failing to file a pretrial motion to suppress Detective Regalado's testimony and for failing to properly preserve Bethel's First, Fifth, and Fourteenth Amendment challenges to the admission of Regalado's testimony, Prejean's testimony and State's Exhibit 77.  Dkt. # 1, Pet., at 26.  But Bethel acknowledges, in his reply brief, that trial counsel did file a pretrial motion to suppress Regalado's testimony.  Dkt. # 18, Reply Br., at 35.  This leaves only Bethel's complaint that but for trial counsel's failure to contemporaneously object to the admission of certain evidence at trial, the OCCA would have reviewed his First, Fifth and Fourteenth Amendment challenges to the admission of that evidence under an abuse of discretion standard rather than under a plain-error standard.  Dkt. # 18, Reply Br., at 35.  True, the OCCA applied plain-error review when it rejected Bethel's challenges to the admission of Detective Regalado's testimony and his First and Fourteenth Amendment challenges to the admission of Prejean's testimony and State's Exhibit 77.  Dkt. # 9-3, OCCA Op., at 9, 24, 39. But in each instance, the OCCA found no actual error.  Dkt. # 9-3, OCCA Op., at 18, 24, 40-41. Bethel therefore cannot demonstrate any resulting prejudice even if he can show that trial counsel performed deficiently in failing to properly preserve these alleged errors for appellate review.

Because the IATC claim asserted in ground five is procedurally barred and, alternatively, lacks merit, the Court denies the petition as to ground five.

## 2. **Brady/Napue** claim

In ground seven, Bethel claims that the prosecutor violated his Fourteenth Amendment rights to due process and a fair trial, as interpreted in Brady v. Maryland, 373 U.S. 83 (1963), and Napue v. Illinois, 360 U.S. 264 (1959), (1) by withholding evidence of a tacit agreement the state had with Dolan Prejean wherein the state offered Prejean a lenient sentencing deal in exchange for his trial

testimony and (2) by failing to correct Prejean's testimony when Prejean falsely testified he had no

deal with the state.  Dkt. # 1, Pet., at 29-30; Dkt. # 18, Reply Br., at 37-43.

Crow contends, and the record supports, that Bethel procedurally defaulted this claim in state

court.  Dkt. # 9, Resp., at 42.  Bethel first raised the Brady/Napue claim when he moved to amend

or supplement his first application for postconviction relief.  Dkt. # 9-14, Mot., at 3-4.  In support

of the motion, Bethel alleged that he discovered new evidence in December 2015 to support his

claim that Prejean, who pleaded guilty as to four felonies in November 2009, received a lenient

sentence in January 2013, after he testified against Bethel.  Dkt. # 9-14, Mot., at 3-4.  While his

motion was pending, Bethel filed a third application for postconviction relief, asserting the

Brady/Napue claim as his seventh proposition for relief.  Dkt. # 9-15, Third Appl., at 68-72.

The state district court denied Bethel's request to amend or supplement the first application

for postconviction relief, reasoning that the time to do so expired when Bethel failed to perfect a

postconviction appeal from the order denying the first application because, at that time, the state

district court's order became a final judgment that was "no longer subject to further litigation,

supplementation, or amendment."  Dkt. # 9-17, Order (Mar. 1, 2017), at 6-7.  The state district court

found that the Brady/Napue claim raised in the third application was not, but could have been, raised

in the first application for postconviction relief and was thus barred by the doctrine of waiver.  Dkt.

# 9-17, Order (Mar. 1, 2017), at 10.

The OCCA affirmed both of these rulings and expressly rejected Bethel's assertions (1) that

prison conditions and his status as a pro se litigant were "sufficient reason[s]" for not previously

raising "several of his current post-conviction claims," including his Brady/Napue claim, in his first

application for postconviction relief and (2) that he "did not have a full and fair opportunity" to

51

litigate his newly-asserted claims when filing his first application. Dkt. # 9-21, OCCA Order, at 3-6;
see OKLA. STAT. tit. 22, § 1086 (limiting the grounds for postconviction relief to claims "which for
sufficient reason was not asserted or was inadequately raised" in a prior proceeding).  The OCCA's
determination that Bethel waived his Brady/Napue claim by failing to assert it in his first application
for postconviction relief is based on an independent and adequate state procedural rule.  See Cannon
v. Gibson, 259 F.3d 1253, 1269 (10th Cir. 2001) (reaffirming "that § 1086 is an adequate state bar
to Brady claims which could have been, but were not, raised on direct appeal); Hale v. Gibson, 227
F.3d 1298, 1330 (10th Cir. 2000) ("Oklahoma's bar on raising claims on post-conviction that could
have been raised on direct appeal is an independent and adequate state bar with regard to Brady
claims.").  The record thus supports Crow's contention that the Brady/Napue claim is procedurally
defaulted.

As cause to excuse the procedural default of this claim, Bethel alleges that appellate counsel
was ineffective for failing to raise the Brady/Napue claim because it "was obvious from the record
on appeal."  Dkt. # 18, Reply Br., at 36.  As just discussed, Bethel cannot rely on his IAAC claim
to establish cause for the procedural default of the Brady/Napue claim because the IAAC claim is
also procedurally defaulted.  Carpenter, 529 U.S. at 451-53.  Bethel further alleges that he could not
present the claim in his first application for postconviction relief (1) "due to the prosecutorial
misconduct and deception of suppressing, concealing and withholding the materials underlying the
claims for the defendant, his defense and appellate attorney," and (2) because his mother provided
him new evidence to support  the claim on December 28, 2015, when she gave him an "offender
look-up print out" reflecting that Prejean was not eligible for the lenient sentence he received in
January 2013.  Dkt. # 18, Reply Br., at 37-42.  In Cannon, the Tenth Circuit recognized that "a

prosecutor's failure to disclose exculpatory materials may in certain circumstances serve as cause for the failure to raise a <u>Brady</u> claim in the appropriate state proceeding." 259 F.3d at 1269. But here, the Court finds it unnecessary to consider whether either of these reasons are sufficient to establish the requisite cause, because the <u>Brady</u>/<u>Napue</u> claim fails on the merits.

In support of his ground seven claim, Bethel alleges that Prejean pleaded guilty as to four felony offenses on November 16, 2009, but did not receive a sentence in that case until January 17, 2013, after Prejean testified against Bethel and each of his co-conspirators. Dkt. # 1, Pet., at 29. Bethel further alleges that Prejean had several prior felony convictions when he entered his guilty plea and he received concurrent suspended sentences even though he was ineligible to receive suspended sentences absent a written waiver from the state. Dkt. # 1, Pet., at 29. Thus, Bethel argues, the only explanation for Prejean's lenient sentence is that he had a "tacit prosecution leniency deal"—a deal that the prosecutor failed to disclose and knowingly permitted Prejean to falsely deny when he testified at trial. Dkt. # 1, Pet., at 29-30.

"Beginning with its seminal decisions in <u>Napue v. Illinois</u>, 360 U.S. 264 (1959), and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the Supreme Court established the principle that criminal convictions obtained by presentation of known false evidence or by suppression of exculpatory or impeaching evidence violates the due process guarantees of the Fourteenth Amendment." <u>Douglas v. Workman</u>, 560 F.3d 1156, 1172 (10th Cir. 2009). "To establish a <u>Brady</u> claim, 'the defendant must prove by a preponderance of the evidence: (1) the government suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material.'" <u>United States v. Garcia</u>, 793 F.3d 1194, 1205 (10th Cir. 2015) (quoting <u>United States v. Reese</u>, 745 F.3d 1075, 1083

53

(10th Cir. 2014)).  "A <u>Napue</u> violation occurs when (1) a government witness committed perjury, (2) the prosecution knew the testimony to be false, and (3) the testimony was material."  <u>Id.</u>

In either situation, materiality is the metric used to measure prejudice.  "[F]avorable evidence is material, and constitutional error results . . . 'if there is a reasonable probability that, had the evidence been disclosed to the defense,'" or had the state not knowingly presented false evidence, "'the result of the proceeding would have been different.'"  <u>Kyles v. Whitley</u>, 514 U.S. 419, 433-34 (1995) (quoting <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985)).  "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression [or knowing presentation of false testimony] 'undermines confidence in the outcome of the trial.'"  <u>Id.</u> (quoting <u>Bagley</u>, 473 U.S. at 678).

Here, on direct and cross-examination, Prejean testified at Bethel's trial that he pleaded guilty in November 2009 to resolve several felony charges against him and that he had no deal with the state for a favorable sentencing recommendation in exchange for his testimony against Bethel.  Dkt. # 10-16, Tr. Trial vol. 3, at 14 [378], 34 [398], 42-45 [406-09], 51-55 [415-19], 66-67 [430-31]. Even if the Court assumes, without deciding, (1) that Prejean's testimony was false, (2) that the prosecutor knew the testimony was false and failed to correct it, and (3) that the state failed to disclose that it had an agreement with Prejean to recommend a lenient sentence, the Court finds that the allegedly suppressed evidence of, and allegedly false testimony about, the alleged tacit agreement was not material.

Bethel's jury had every reason to question Prejean's motives and credibility.  Through Prejean's own testimony, the jury heard about Prejean's extensive criminal history, which included several prior convictions for crimes of dishonesty, Prejean's former status as a high ranking gang

member, and Prejean's willingness to provide incriminating information about other inmates to law enforcement while he was incarcerated and awaiting sentencing on his own charges. Dkt. # 10-16, Tr. Trial vol. 3, at 4-72 [368-436].

Nevertheless, while Prejean's testimony was important, it was far from critical to obtaining Bethel's convictions. The state presented evidence from other witnesses to establish that Aziz recruited Allen Shields to find someone to murder Sweeney, that Allen and Fred Shields agreed to find someone in exchange for $10,000, that Fred met Bethel met while both were incarcerated in the Osage County jail, that Fred and Bethel discussed killing Sweeney, that Bethel agreed to kill Sweeney, and that Fred made arrangements to bond Bethel out of jail only few days before the murder. Dkt. # 9-3, OCCA Op., at 3-4. The state also presented evidence from witnesses other than Prejean establishing that Fred recruited Alonzo "Jack" Johnson to borrow the commercial van that he then delivered to Bethel, that Allen saw Bethel with Johnson on the morning of September 4, 2008, that Johnson met with Allen that morning to confirm that Aziz had the money, and that Johnson identified Bethel, not by name, but as "the guy" he "was taking . . . to go do the murder that morning." Dkt. # 9-3, OCCA Op., at 4; Dkt. # 10-20, Tr. Exs. (envelope 1, part 2), at 44-47.

In addition, Debra Townsend, one of Sweeney's co-workers, testified that she saw a black male dressed in dark clothing and wearing sunglasses walk into Sweeney's business on the morning of September 4, 2008, walk past her, walk into Sweeney's office and stretch his arm in Sweeney's direction, right before Townsend heard gunshots. Dkt. # 9-3, OCCA Op., at 5; Dkt. # 10-15, Tr. Trial vol. 2, at 129 [251], 138-45 [260-67]. And Bethel effectively confirmed Townsend's account of the shooting in his own words, which were admitted at trial through the admission of State's Exhibit 77. Bethel stated that the "Arabs" identified which business park housed Sweeney's office,

that he went to the business "early in the morning," that he was dressed in "all black" and wore "black shades," that there was a woman near a desk by the front door, and that he "walked right past her" with his "head down," he [w]ent in the dude office, hit him and walked out." Dkt. # 11, State's Ex. 77, at 27:00-31:15; see also, Dkt. # 10-8, Preliminary Hr'g Exs., at 28-31 (transcript of State's Ex. 77).

Under the facts of this case, even if the jury had been presented with direct evidence that the state had a formal, written agreement offering Prejean leniency in exchange for his testimony, the Court finds no reasonable probability that the result of Bethel's trial would have been different.

Because Bethel procedurally defaulted his Brady/Napue claim and any success in overcoming the procedural default would only result in a rejection on the merits of that claim, the Court denies the petition as to ground seven.

### 3.    Ineffective assistance of appellate counsel

Bethel's final claim is his ground six claim that he was denied his Sixth Amendment right to the effective assistance of appellate counsel. Dkt. # 1, Pet., at 27-28. In support of his ineffective-assistance-of-appellate-counsel (IAAC) claim, Bethel alleges that appellate counsel (1) failed to argue that trial counsel was ineffective (for the reasons alleged in ground five of the petition), (2) failed to argue that the prosecutor committed misconduct by concealing evidence of a tacit agreement with Prejean and failing to correct Prejean's perjury about that agreement (as alleged in ground seven of the petition), (3) failed to request an evidentiary hearing to support his religious privilege and First Amendment claims, and (4) failed to adequately argue his First and Fifth Amendment challenges to the admission of State's Exhibit 77 and Prejean's testimony (as alleged in ground two of the petition). Dkt. # 1, Pet., at 27-28.

As previously discussed, Bethel procedurally defaulted this claim in state court.  In his petition, Bethel appears to argue that he can establish cause for the procedural default because appellate counsel was ineffective for failing to argue her own ineffectiveness.  Dkt. # 1, Pet., at 27-28.  It is not clear how appellate counsel could have done so.

Regardless, based on the Court's analysis of Bethel's substantive claims, the Court finds it easier to overlook the procedural default and deny the IAAC claim on the merits.  This claim too is governed by Strickland's two-part test.  Smith v. Robbins, 529 U.S. 259, 285 (2000).  As framed in Robbins, a defendant alleging appellate counsel was ineffective must show counsel performed deficiently and that, but for counsel's deficient performance, "he would have prevailed on his appeal."  529 U.S. at 285-86.  Ordinarily, in considering whether appellate counsel performed deficiently, courts "look to the merits of" the issue or issues that the defendant alleges was improperly omitted or inadequately argued.  Miller v. Mullin, 354 F.3d 1288, 1298 (10th Cir. 2004) (quoting Cargle v. Mullin, 317 F.3d 1196, 1202 (10th Cir. 2003)).  In Cargle, the Tenth Circuit provided the following guidance for evaluating an IAAC claim:

> If the issue is so plainly meritorious that it would have been unreasonable to winnow it out from an otherwise strong appeal, its omission may directly establish deficient performance; if the omitted issue has merit but is not so compelling, the case for deficient performance is more complicated, requiring an assessment of the issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission; of course, if the issue is meritless, its omission will not constitute deficient performance.

Cargle, 317 F.3d at 1202.

For the reasons previously discussed in addressing each of Bethel's substantive claims, the Court finds that those issues appellate counsel raised on appeal were adequately argued and those issues appellate counsel omitted were meritless.  The Court therefore finds that appellate counsel did

not perform deficiently, much less prejudicially, in representing Bethel on appeal or in failing to request an evidentiary hearing.  Because the IAAC claim is procedurally defaulted and fails on the merits, the Court denies the petition as to ground six.

### CONCLUSION

The Court concludes that Bethel is not entitled to federal habeas relief on any claims asserted in his petition.  The Court therefore denies the petition for writ of habeas corpus and denies as moot Bethel's requests for an evidentiary hearing.  In addition, after full consideration of Bethel's claims, the Court finds that reasonable jurists would not debate the correctness of this Court's assessment of his constitutional claims, or its assessment that at least a portion of his ground two claim alleges only an error of state law.  The Court therefore further concludes that no certificate of appealability should issue as to any claims.  Slack v. McDaniel, 529 U.S. 473, 484 (2000); 28 U.S.C. § 2253(c)(1); Rule 11, Rules Governing Section 2254 Cases in the United States District Courts.

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1. The Clerk of Court shall note the substitution of Scott Crow in place of Jerold Braggs as party respondent.

2. Bethel's requests for an evidentiary hearing are **denied**.

3. The petition for writ of habeas corpus (Dkt. # 1) is **denied**.

4. A certificate of appealability is **denied**.

5. A separate judgment shall be entered in this matter.

**DATED** this 8th day of March, 2021.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

58